UNITED STATES of America, ex rel. Benny D. HULLINGER, Roger Kreimeyer, Ernest Martinez and Royle Johnson, Plaintiffs,

v.

HERCULES, INC., Defendant.

No. 2:92–CV–0085–S.

United States District Court, D. Utah, Central Division.

Jan. 22, 1999.

Daniel D. Price, Asst. U.S. Atty., District of Utah, Salt Lake City, UT, Rosemary A. Filou, U.S. Department of Justice, Washington, DC, Evan A. Schmutz, Lance L. Long, Wm. Kelly Nash, Hill Johnson & Schmutz, Provo, UT, for plaintiffs.

Keith E. Taylor, Randy L. Dryer, Michael L. Larsen, Parsons Behle & Latimer, Salt Lake City, UT, Robert K. Huffman, Miller & Chevalier Chartered, Washington, DC, for defendant.

## MEMORANDUM DECISION

SAM, Chief Judge.

Before the court is the joint motion of relators Benny D. Hullinger, Roger Kreimeyer, Ernest Martinez, and Royle Johnson and defendant Hercules, Inc. for an order of the court approving the proposed settlement agreement between these parties and dismissing this case with prejudice.

## FACTUAL BACKGROUND

This case has a long and complex history which the court, with the assistance of each of the parties, has attempted to summarize. During 1990, relator Benny D. Hullinger, an employee of defendant Hercules, Inc., concluded defendant was engaging in fraudulent practices concerning the submission of false claims on govern-

ment missile contracts. When he attempted to report his findings to defendant and subsequently notified the government, he was allegedly retaliated against, demoted, and ultimately terminated.

On or about January 24, 1992, relator Hullinger filed a pro se complaint, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729, et seq. (sometimes hereafter referenced as FCA), under seal and served it upon the United States. The complaint alleged defendant had engaged in false claims activities and fraudulent practices with regard to a number of defendant's missile system contracts with the government and had discharged relator Hullinger for reporting these practices. After relator Hullinger filed his complaint, relators Roger Kreimeyer, Ernest Martinez, and Royle Johnson, also former employees of defendant, informed relator Hullinger that they each had additional knowledge of defendant's alleged fraudulent practices and had also been the victims of retaliatory discharge for reporting their information. Thereafter, relators Hullinger, Kreimeyer, Martinez, and Johnson jointly retained the services of a Salt Lake City law firm.

On or about March 11, 1992, relators filed an amended complaint under seal which was served upon the United States. The amended complaint alleged that additional missile systems at a number of defendant's facilities were involved in fraudulent activity during time periods ranging from 1982 through 1991 and from 1982 until the present time. The complaint further alleged damages arising from the retaliatory discharge of each of the four relators. Also on or about March 11, 1992, in conjunction with the amended complaint, relators served upon the United States a 15–page report of "substantially all material evidence and information" they possessed in support of the claims in the amended complaint, pursuant to 31 U.S.C. § 3730(b)(2), including copies of supporting documentation.

For approximately the next two and one-half years, relators and their counsel made themselves available to assist in the United States' investigation of their claims. Relators were interviewed by the government on numerous occasions and provided ongoing information. Because the case was under seal and could not be served upon defendant, pursuant to 31 U.S.C. § 3730(b)(3), relators and their counsel were prevented from conducting discovery or otherwise investigating their claims. The United States focused its investigation upon those areas where its representatives, in consultation with relators, hypothesized that relators' allegations could best be tested through audits. Throughout the investigation, the United States consulted with and sought assistance from relators.

The government's investigation included issuing a subpoena to defendant, in June 1992, for documents related to relators' allegations. The subpoena required defendant to produce documents relative to cost, labor, and personnel time records for various missile contracts between defendant and the government. Defendant produced thousands of pages of documents in response to the subpoena which were reviewed by government agents from late 1992 through early 1994. In addition, government agents conducted interviews of approximately 20 former employees of defendant concerning relators' allegations.

On or about August 4, 1992, the United States sought a 90–day extension of the deadline for filing its notice to intervene in the action. Relators did not oppose the motion. On or about August 7, 1992, the United States' motion was granted.

On or about September 15, 1992, at the United States' request, relators provided the United States with a 23–page report containing further information in support of the claims in the amended complaint.

The United States proceeded to request additional time in which to investigate relators' claims. On or about November 3, 1992, the United States filed a second unopposed motion for a 90–day extension for filing its notice to intervene. This motion was granted on or about November

7, 1992. On or about February 4, 1993, the United States filed a third unopposed motion for a 90–day extension in which to file its notice to intervene. This motion was granted on or about February 6, 1993. On or about May 6, 1993, the United States filed a fourth unopposed motion for a 90–day extension in which to file its notice to intervene. This motion was granted on or about May 8, 1993. On or about August 5, 1993, the United States filed a fifth unopposed motion for a 90–day extension which was granted on or about August 7, 1993. On or about November 5, 1993, the United States filed a sixth unopposed motion to extend the time in which to file its notice to intervene. This motion was granted on or about November 8, 1993. On or about February 7, 1994, the United States filed a seventh unopposed motion, requesting an additional 60 days in which to file its notice to intervene. This motion was granted on or about February 10, 1994.

On or about April 8, 1994, the United States sought a partial lifting of the stay in order to permit it to disclose relators' complaint to and discuss the claims therein with defendant in an effort to resolve the matter without further litigation. Relators did not oppose this motion which was granted on or about April 12, 1994.

In May 1994, relators' law firm informed relators that it would no longer represent relators in this matter. On or about May 11, 1994, relators retained a small Salt Lake City law firm to represent them. Relators' new counsel began searching for a larger firm to act as co-counsel in the event the United States declined to intervene.

Also during May 1994, the United States exchanged information with defendant concerning relators' claims. Representatives of the government and of defendant met on or about May 17, 1994 to discuss relators' allegations and the evidence uncovered by the government's investigation. At this meeting, the government provided defendant with a three-page audit analysis of certain of defendant's time records.

Following this meeting, defendant conducted an intensive internal investigation of the specific allegations contained in the government's three-page analysis. In a letter dated May 18, 1994, counsel for the United States informed defendant's counsel that "the United States believed that the case it has investigated involved broad-based mischarging from closed cost codes on fixed-price Government contracts to cost plus Government contracts and overhead." Defendant responded to the government's letter with a letter, dated May 24, 1994, stating that defendant had examined the allegations and had not found any violations or "departure" from acceptable standards.

On or about May 25, 1994, United States' counsel, government investigators, relators and their counsel, and defendant and its counsel met to discuss relators' allegations, the United States' investigation, defendant's responses, and the possibility of settlement. At this time, counsel for the United States advised relators and their counsel that the United States would likely decline to intervene. Thereafter, defendant met repeatedly with government representatives to go over documents defendant obtained in its investigation.

During the first week of June 1994, relators, through counsel, verbally requested that the United States obtain additional documents and investigate more thoroughly the alleged fraudulent use of time cards by defendant. The United States agreed to consider this request and perform another, more limited, investigation before giving formal notice of its decision concerning intervention. On or about June 9, 1994, the court granted the United States' eighth unopposed motion for an extension of time in which to give notice of its decision on intervention, giving the United States an additional 60 days.

During June 1994, relators retained another, larger, Salt Lake City law firm to act as co-counsel, hoping its greater resources would aid in pursuing their claims

should the United States decline to intervene.

On or about July 27, 1994, United States' counsel, government agents, relators and their counsel, and defendant and its counsel met again to discuss the United States' additional investigation and to attempt to resolve this matter. At the conclusion of the meeting, counsel for the United States advised relators and their counsel that the United States would not intervene because it had not found and did not believe it could find evidence sufficient to prove relators' claims. Relators' counsel asked counsel for the United States to provide relators with the fruits of the government investigation, but counsel for the United States refused.

On or about August 13, 1994, after receiving the United States' formal notice to decline intervention, the court entered an order reflecting that the United States would not intervene, unsealing the complaint, and ordering the complaint to be served upon defendant. The order provided, in part:

> [P]ursuant to 31 U.S.C. § 3730(c)(3), (1) the parties shall serve copies of all future filings by all parties in this action upon the United States through its counsel and (2) if the United States so requests and at its expense, the parties shall supply copies of transcripts of depositions taken in this action. It is further
>
> ORDERED that, pursuant to 31 U.S.C. § 3730(b)(1), the relator may carry on the action in the name of the United States, but the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting". . . .

As a result of this order, the United States understood that the court would require the United States to consent before relators could settle and dismiss this qui tam action. All other documents filed during the period the case was sealed were ordered to remain under seal. Defendant was served with the first amended complaint in November 1994.

Subsequently, relators and defendant entered into open investigation and discussion concerning relators' claims. Because the parties agreed to conduct informal discovery and exchange witnesses and documents, no formal pleadings were filed with the court. Between late 1994 and April 1996, relators and their counsel conducted approximately 150 witness interviews, assembled documents, correlated evidence, and retained the services of an accounting firm to analyze the damages for each relator's claims for alleged retaliatory discharge.

In April 1996, relators prepared a second amended complaint. Before it was filed, however, the larger law firm serving as relators' co-counsel notified relators of its intention to withdraw from the case. As a result of co-counsel's withdrawal, relators were forced to limit the scope of their prosecution as they could not afford to pay for auditors or other professionals to investigate and perform damages analyses. As a result of their informal investigation, relators and their counsel believed defendant had engaged in false claims activities, but they felt they could not quantify the damages sufficiently to support a damages award. During the latter part of 1996 and much of 1997, the case languished because of the difficulties and expense required to pursue relators' claims.

Because there had been no activity recorded on the docket sheet and neither relators nor defendant wrote to, telephoned, or served any substantive paper upon the United States concerning this case, government counsel believed this matter to be moot. In July 1997, however, after receiving notice that the case had been reassigned, counsel for the United States contacted relators' counsel to inquire about the status of the case. Relators' counsel was unavailable at the time and was unsuccessful in returning government counsel's telephone call. On August 13, 1997, counsel for the United States

sent a letter to relators' counsel, again requesting an update on the status of the case and stating, in part:

> Although I was of the belief that the above matter had long ago been voluntarily dismissed by your clients (subsequent to the United States' filing its notice of declination), I recently received a notice from the federal district court that indicated that the above matter was being reassigned to Judge David Sam, which indicated to me that the case was still pending.

Counsel's letter then discusses requirements concerning the settlement of a qui tam action.

During the late summer of 1997, relators encouraged their counsel to continue with the case by pursuing settlement or an expedited trial schedule, based on the assembled evidence. Relators' counsel then contacted counsel for defendant and requested that an answer be formally filed. In the course of the conversation, both counsel agreed to meet informally to examine witnesses and review the evidence supporting relators' claims.

On December 5, 1997, the court conducted a status and scheduling conference. Counsel for relators and defendant attended while counsel for the United States participated by telephone. Defendant's counsel advised the court of its involvement in another pending qui tam action, *United States ex rel. Colunga v. Hercules,* Case No. 2:89CV954B (D.Utah filed Oct. 24, 1989), and both relators' and defendant's counsel informed the court that ongoing discussions were occurring. Also, on or about December 5, 1997, relators filed their second amended complaint and served it upon the United States. Counsel for the United States subsequently informed relators' counsel that the second amended complaint would have no impact on the government's earlier decision not to intervene. Therefore, the 60-day statutory seal period expired without any notice from the United States, and the United States filed no motion to extend the time in which to give notice of its intervention.

In February 1998, relators' damages expert completed his report addressing relators' damages arising from their retaliatory discharges. The damage report indicated that relators had sustained economic damages in the aggregate amount of approximately $3,350,000.

On or about March 6, 1998, relators and their counsel and defendant and its counsel met all day to exchange witness testimony and evidence. Relators both proffered evidence and submitted to examination concerning their retaliatory discharge claims. Defendant offered some rebuttal but wished to investigate relators' claims further. The parties agreed to reconvene to discuss defendant's responses and pursue the possibility of settlement. Following this meeting, defendant performed an internal investigation but found no evidentiary basis for relators' claims.

Later in March or April 1998, counsel for relators and defendant met again to discuss defendant's responses to testimony at the prior meeting and settlement. At this time, defendant reported that it had conducted a thorough investigation of each claim and could find no evidence to support any of the mischarging claims. However, without conceding liability, defendant recognized arguable issues on three items which would amount to approximately $590,000 in damages to the United States if relators could prove the false claim and damages.

Relators and their counsel found much of defendant's rebuttal information credible and persuasive. They also believed the cost of establishing a case for trial would be enormous because it would necessitate an audit of much greater scope than the United States had performed over two and one-half years. They concluded that the cost of going forward would not be worth the anticipated recovery of approximately $500,000 to $600,000. After evaluating their claims, relators believed their strongest claims were the claims of each relator for retaliatory discharge. Even defendant's counsel con-

ceded there was a significant risk that a jury would find for relators on the issue of the individual terminations. Moreover, both parties concluded the damage report prepared by relators' expert presented credible evidence of loss to relators.

The parties began settlement discussions. During such discussions, the parties appeared before the court at status and scheduling conferences to report their progress. The United States was not represented at these conferences.

On or about August 7, 1998, relators and defendant reached a settlement and presented a proposed settlement agreement to the court. That same day, relators' counsel telephoned counsel for the United States, reported the settlement, and delivered a copy of the proposed agreement to government counsel. The proposed settlement agreement provides for a total payment by defendant of $4.5 million, to be allocated as follows: (1) $600,000 to the United States for relators' claims of defendant's fraudulent activity (less the statutory percentage to relators); (2) $3,678,325 to relators for their personal claims of retaliatory discharge; and (3) $221,675 to relators' counsel for attorney fees, costs, and expenses. In exchange for defendant's payment, the settlement agreement provides for relators to release, on behalf of themselves and the United States, the False Claims Act claims alleged in their second amended complaint. This release language was based purportedly upon release language provided to defendant by government counsel during the settlement negotiations in the *Colunga* litigation which was resolved in July 1998. At the parties' request, the court scheduled a hearing for August 18, 1998 to entertain any objections the government might have to the proposed settlement and consider dismissing this action with prejudice.

On or about August 11, 1998, defendant's representatives met with government counsel to discuss the parties' proposed settlement agreement. At this time, governmental counsel stated that it would be difficult for the United States to con-

sent to the settlement, based on the apportionment of monies and the broad scope of the release. The parties agreed to continue the hearing on the approval of the proposed settlement until August 25, 1998.

In a telephone conference with all parties, on or about August 17, 1998, counsel for the United States advised relators and defendant that the United States would not agree to a release broader than the claims the United States had actually investigated, but government counsel would need to reconstruct what matters the United States had investigated prior to declining to intervene. On or about August 21, 1998, after a discussion with government counsel, defendant's counsel indicated that they wanted to attempt to reach a compromise agreement with the United States on the scope of the release but would need information on the United States' investigation. On August 24, 1998, government counsel wrote defendant that they were in the process of gathering information on the investigation and would need additional time. Government counsel also requested defendant's assistance in detailing the exact scope of the investigation.

During the hearing on August 25, 1998, the court expressed its preliminary view that the government, by its inaction, had essentially consented to the settlement agreement. The court, however, urged the parties to be in accord with each other and provided additional time, until September 11, 1998, in which to reach agreement concerning the scope of the release. The court indicated that, if the parties' efforts failed, each party should submit additional briefs within five days thereafter.

The parties informed the court that, despite their best efforts, they were unable to agree on a mutually acceptable scope of release in the proposed settlement agreement. The court must now consider whether it can approve the settlement as proposed and dismiss this case with prejudice as requested or whether the United States' objections to the proposed settle-

ment between relators and defendant have merit.

## DISCUSSION

### I. *Statutory Consent*

■ At the heart of the pending joint motion is section 3730 of the False Claims Act which sets forth the procedures for maintaining civil actions for false claims. Both parties focus upon subsection 3730(b)(1) which provides as follows:

A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. *The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.*

31 U.S.C. § 3730(b)(1) (Supp.1998) (emphasis added). Based on this subsection, the United States argues the court cannot approve the proposed settlement between relators and defendant without its written consent. Relators and defendant, however, contend this subsection poses no obstacle to such court approval because the government's consent is not necessary.

The court begins its analysis by considering the plain language of the provisions in section 3730.[1] Subsection 3730(b)(1) is included in that part of section 3730 addressing the initial procedures for filing a qui tam action. The subsection requires the qui tam complaint and all of the relator's material evidence to be served first upon the government and filed under seal for 60 days. During the 60–day period, which may be extended upon the government's motion, and before the defendant is notified of the suit, the government is given the opportunity to investigate the case. Then, before the 60–day period or its extensions expire, the government must notify the court of its decision to proceed with or decline to take over the action. Thus, placing section 3730(b)(1) in context, it appears to the court that requiring the Attorney General's written consent to a dismissal is limited to the initial period in which the government is deciding whether to intervene. *See, e.g., United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 722 (9th Cir.1994) ("[T]he consent provision contained in § 3730(b)(1) applies only during the initial sixty-day (or extended) period.").[2]

The government contends that such a construction would render the Attorney General's consent virtually meaningless. The court disagrees. While it is true that, because a defendant is not served with the complaint during the initial 60–day period, the relator and the defendant would have no opportunity to settle during this time; nevertheless, the Attorney General must give written consent in order for the relator to dismiss the action before the government's opportunity to investigate the case ends with the expiration of the 60–day period.

The requirement of obtaining the Attorney General's consent to dismissal is found in no other clause of section 3730 and, indeed, would seem to conflict with its other provisions. For example, should the government decline to take over the action

---

1. *See, e.g., United States v. Louisiana Pacific Corp.*, 106 F.3d 345, 349 (10th Cir.1997) ("Although [a statute] must be liberally construed to effectuate its purposes, a court cannot interpret a statute in a way fundamentally inconsistent with its plain language in the name of liberal construction.... [A] plain language reading of [the statute] best comports with this circuit's precedent setting forth our principles of statutory construction."); *United States v. Green*, 967 F.2d 459, 461 (10th Cir.) ("To interpret any statute, we must begin with the plain language of the statute itself.... If the terms of the statute are unambiguous, our inquiry ends."), *cert. denied*, 506 U.S. 963, 113 S.Ct. 435, 121 L.Ed.2d 355 (1992).

2. *But see Searcy v. Philips Elec. North America Corp.*, 117 F.3d 154, 159 (5th Cir.1997) ("The statutory language relied on by the government is as unambiguous as one can expect: 'The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.' Unlike the Killingsworth court, we can find nothing in § 3730 to negate the plain import of this language.").

after the initial investigatory period, the section provides that "the person bringing the action shall have the right to *conduct the action.*" 31 U.S.C. § 3730(b)(4)(B) (emphasis added); *see also* 31 U.S.C. § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action.") Moreover, "[i]f the Government does not proceed with an action under this section, the person bringing the action or *settling the claim* shall receive an amount which the court decides is reasonable...." 31 U.S.C. § 3730(d)(2) (emphasis added). As the Ninth Circuit Court of Appeals has recognized, "[t]he right to conduct a qui tam action obviously includes the right to negotiate a settlement in that action." *Killingsworth,* 25 F.3d at 722. Granting the government an absolute right to prevent the consummation of a settlement, by withholding its consent, would appear to be inconsistent with granting the relator the right to conduct and settle the suit.[3] The court believes that, were the government to have such a right, it would have the power to hold the relator and the defendant hostage indefinitely, forcing the litigation to continue, regardless of the fact that a settlement had been reached. *See Killingsworth,* 25 F.3d at 723 ("[T]he government may not force [the relator and the defendant] to continue litigation by refusing to consent to a settlement."). Such a result cannot be tolerated. The statute also states that, "[w]hen a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause." 31 U.S.C. § 3730(c)(3). Allowing the government to block a settlement by withholding consent disregards this part of the statute by essentially allowing the government to intervene without good cause.

Finding that a reasonable interpretation and understanding of subsection 3730(b)(1)

is clear from the plain language of the statute, the court need look no farther. The court, however, is of the opinion that interpreting subsection 3730(b)(1) to permit the government to interpose an absolute bar to a settlement reached between a relator and a defendant would not harmonize with the purposes behind the False Claims Act. As the Ninth Circuit has explained, Congress has amended the Act to provide various incentives to encourage individuals to come forward with information, institute suits for the benefit of the government, and follow through with litigation. *See Killingsworth,* 25 F.3d at 721; *see also United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568, 572 (10th Cir.1995) ("Congress instituted the qui tam provisions of the FCA to encourage private citizens to expose fraud that the government itself cannot easily uncover."). This court agrees that such congressional intent "is fundamentally inconsistent with the asserted 'absolute' right of the government to block a settlement and force a private party to continue litigation." *Id.* at 722.

Accordingly, as the initial 60–day investigatory period and multiple extensions of that period have expired, and relators have not only conducted the action but have negotiated a settlement, the court concludes the Attorney General's written consent is not a prerequisite for this court to approve the proposed settlement and dismiss this action with prejudice.

## II. *Consent by the United States*

■ The outcome in this case would not change, however, even if the court concluded that governmental consent was required before the court could approve the proposed settlement and dismiss the case. In the court's view, the facts reveal that the government has essentially consented to dismissal.

The government was not only notified of relators' claims, but investigated them for

---

3. *But see Searcy,* 117 F.3d at 160 ("The power to veto voluntary settlements, then, does not conflict with the relator's statutory right to

control the litigation when the government chooses to remain passive.").

over two years, obtaining eight extensions of time in which to file its notice of intervention. During this time, government agents reviewed relators' reports, interviewed relators numerous times and sought their continued assistance, reviewed thousands of pages of documents produced by defendant, and interviewed many of defendant's former employees concerning relators' allegations. The government also engaged in discussions and exchanged information with defendant concerning relators' claims. After having ample opportunity to engage in a thorough investigation, the government concluded the case did not merit its intervention.[4]

Thereafter, however, relators and their counsel, without the fruits of the government's investigation, proceeded with the litigation, ultimately negotiating a settlement.[5] In a letter to relators' counsel, dated August 13, 1997, counsel for the United States expressed surprise to discover the case was still pending; government counsel stated, "I was of the belief that the above matter had long ago been voluntarily dismissed by your clients (subsequent to the United States' filing its notice of declination)...." As relators point out, this letter reveals that the United States did not object, at that time, to having this case dismissed without any recovery and, in fact, expected that result. Now, with relators and defendant on the verge of consummating a settlement that

benefits, in part, the United States, the United States asserts it does not consent. In view of these circumstances, the court is inclined to conclude the government has already consented to the proposed settlement agreement and, consequently, finds the government's objections disingenuous.

Moreover, in its letter of August 13 to relators' counsel, the United States set forth the procedure under which it would consent to a settlement between relators and defendant. The court is of the opinion that relators and defendant have satisfied each of these requirements.

First, the United States asserted it would not agree to a dismissal with prejudice unless it received a recovery. The proposed settlement agreement provides for a recovery of $600,000 to the United States, an amount both relators and defendant estimated as a reasonable recovery in a successful trial. After reviewing and evaluating the evidence supporting relators' claims, defendant conceded a risk of liability with regard to three False Claims Act allegations, amounting to approximately $590,00, while relators concluded the cost of establishing their other claims outweighed the potential recovery at trial. The parties, thus, incorporated this risk analysis into the settlement amount.

Second, the United States asserted that where, as here, both relators and the government would be receiving damages, it

---

4. Other courts have found that the government's decision to decline intervention equates to a consent to dismissal:

  After reviewing the statute the Court concludes that § 3730(b)(1)[,] when read in the context of the statute as a whole, is intended to ensure that legitimate claims brought by a qui tam plaintiff are not dismissed before the United States has been notified of the claims and has had an opportunity to decide whether the United States should take over the conduct of the action. However, once the United States declines to intervene, the qui tam plaintiff has the right to conduct the action and dismiss or settle the case without the consent of the Attorney General. The decision by the Attorney General not to intervene in and conduct the lawsuit is tantamount to consent by the

Attorney General to have the action dismissed.

  .   .   .   .   .

  The United States does not have a right under § 3730 at this final stage of the litigation to impose conditions and insist that the parties cannot agree to such a settlement without the Attorney General's consent.
  *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life and Accident Ins. Co.,* 811 F.Supp. 346, 347 (E.D.Tenn.1992).

5. Indeed, the court acknowledged these circumstances during the hearing on August 25, 1998: "I am of the view, counsel, that but for the action of the relators, it appears to the Court that this case would be, for all practical purposes, in limbo, if not dead."

would be "careful to ensure that the Government is receiving its fair share of the total settlement amount." As noted above, damage amounts earmarked for relators' various claims resulted from careful analysis of the evidence by the parties. Furthermore, the government's objections to its $600,000 recovery ring hollow in the absence of evidence supporting another amount as more reasonable; indeed, the government believed the case did not even warrant its intervention after over two years of investigation. Concerning the settlement agreement's provision for damages to relators for retaliatory discharge, relators and defendant agreed defendant had a significant risk of exposure on these claims and considered relators' expert report on damages, estimating total economic losses of approximately $3,350,000, to be credible evidence. Moreover, when one considers each of the four relators was also eligible to receive double back pay plus interest, attorney fees and costs, and could have pursued punitive damages, the proposed settlement amount of $3,678,325 allotted to the retaliatory discharge claims does not seem unreasonable.

Third, the United States asserted that, if False Claims Act liability exists, defendant "shall be directly liable to the relator for reasonable expenses and attorney fees and costs" and should pay a reasonable amount directly to relators. The proposed settlement agreement accomplishes just that.

Fourth, the United States asserted that, in declined qui tam actions, relators shall receive approximately 25 to 30 percent of the proceeds awarded to the government. The proposed settlement agreement specifies that relators will receive 25 percent of the government's share, an amount at the lower end of the permissible scale.

Finally, the United States set forth several requirements as to appropriate language to be used in settlement agreements. The proposed settlement agreement was drafted with the United States' approval requirements specifically in mind, having been based upon the language in the settlement agreement the United States approved in the *Colunga* case, and aligns with the allegations of relators' complaint.

The court is, thus, persuaded that, having addressed and met each of the government's requirements concerning settlement, relators and defendant are entitled to hold the government to its assurance of consent to the proposed agreement.

### III. *Objections to Proposed Settlement*

█ Additionally, were the court to consider the merits of the government's objections to the proposed settlement agreement,[6] the court would not find them particularly persuasive in this instance.

In its briefing, the United States basically sets forth two main areas of concern about the proposed settlement agreement. First, because, as here, qui tam suits often include claims personal to the relator, in addition to FCA claims on behalf of the United States, the government is cautious about the allocation of settlement funds between the types of claims. As the government notes, since relators' recovery for FCA claims must be shared with the government, relators have an incentive to allocate as much as possible of the settlement funds to their personal claims, and defendants have no particular incentive to object to such an allocation. In the instant matter, the United States finds the settlement allocation of $600,000 to the FCA claims and $3,678,325 to the relators' personal claims suspect. The court believes, however, that a review of the facts allays this concern. In conjunction with relators' investigation, relators interviewed approxi-

---

**6.** In *Killingsworth,* the Ninth Circuit interpreted the False Claims Act to provide an opportunity for the government's objections to a proposed settlement to be heard by the court. *See Killingsworth,* 25 F.3d at 725. Although the court has found that the government has consented to the settlement agreement, the court, nevertheless, has provided the parties an opportunity to submit supplemental briefing on their positions concerning the proposed settlement which the court has considered.

mately 150 witnesses, defendant performed several extensive internal examinations, and relators and defendants met many times to assemble and review documents, correlate evidence and witness testimony, and evaluate the strength of relators' claims and defendant's position. The parties ultimately agreed there were arguable FCA issues on three items, potentially amounting to approximately $590,000. The parties further agreed that relators' retaliatory discharge claims were not only potentially stronger but supported by credible evidence in a report by a damages expert. At this point, after the government's initial two-year investigation (which resulted in a decision to decline intervention), relators' investigation, and defendant's own internal investigations, it would seem that the United States' concern about releasing potential FCA claims worth millions of dollars amounts to speculation only. The court agrees that relators and defendant, the parties directly involved in conducting the investigation and evaluating the evidence, are in the best position to assess the relative value of relators' FCA and retaliatory discharge claims.

The United States has also expressed concern over the release language in the proposed settlement, for two related reasons. First, the government notes that relators have an incentive to draft their complaint as broadly as possible, with the goal of encompassing as much potential wrongful conduct, and resulting recovery, as possible. Second, the government notes that defendant, likewise, has an incentive to receive the broadest possible language releasing it from claims by the United States. The United States' concern, therefore, is that neither party has an incentive to discern whether the conduct at issue was actually fraudulent. At the outset, the United States argues that, if it were litigating such a matter, it would not draft its claims so broadly nor dismiss with prejudice claims it did not have sufficient evidence to believe were properly relinquished. The United States, however, had an opportunity to intervene in this case

and become actively involved in addressing both of these issues but chose not to do so. Specifically, in the case at bar, the United States objects to defendant receiving immunity for any fraudulent activity that may have occurred, at any of its facilities, in connection with any contract it had with the United States since 1982, in exchange for the sum of $600,000. The parties respond that they negotiated the scope of the release based on the parameters of the claims alleged in relators' second amended complaint. The court is inclined to agree with relators and defendant that the proposed release is, thus, reasonable as it tracks the release the government required, and the court subsequently approved, in the *Colunga* settlement, a qui tam action involving the same defendant.

The court, therefore, is of the view that the proposed settlement is reasonable, and the government's concerns are without basis.

## IV. *Alternatives to Approval of Proposed Settlement*

Finally, the United States has set forth several alternatives to which it will agree despite its objections to the terms of the settlement agreement as currently proposed. The court, however, finds little or no merit in the United States' suggestions.

First, the United States claims it will not reject a reasonable settlement in which its interests are satisfied. It, therefore, proposes that relators, defendant, and the government work together to revise the settlement or craft a new one. It is the court's understanding that this option has already been explored. When additional time was provided for the parties to work together in the manner contemplated by the government, however, counsel were unable to reach agreement. At this juncture, sending all parties back to the drawing board to start over may not be a productive solution.

Second, the United States asserts it will consent to a dismissal with prejudice if the scope of the settlement agreement is limit-

ed exclusively to those matters actually investigated by the United States. The court believes, however, that this option fails to acknowledge the scope and results of relators' continued investigation, including the many discussions concerning claims and supporting evidence between relators and defendant, which followed the United States' departure from active involvement in this case. In reality, as relators and defendant argue, the fruits of the United States' initial investigation comprised only part of the claims and risks defendant faced during the course of the litigation. Under these circumstances, a more limited dismissal with prejudice would still leave defendant exposed to future litigation. It is unrealistic to expect defendant to pay substantial sums for an uncertain settlement.

Third, the United States is willing to consent to the dismissal as proposed, provided it is modified so as to be without prejudice to the United States. This alternative, once again, disregards the terms of the proposed settlement for which the parties bargained. *See, e.g., AeroTech, Inc. v. Estes,* 110 F.3d 1523, 1527 (10th Cir.1997) ("[A] dismissal with prejudice affords a defendant considerably more relief than a dismissal without prejudice.") The United States, thus, invites the court to depart from both the letter and spirit of the proposed agreement and ignore the parties' desire to bring closure to this litigation. The court declines to do so. *See, e.g., Kohr v. Allegheny Airlines, Inc.,* 504 F.2d 400, 405 (7th Cir.1974) ("[I]t was an abuse of discretion for the district court to effectively change the settlement from one providing for dismissal of plaintiffs' complaints with prejudice to one providing for the dismissal without prejudice."), *cert. denied sub nom. Forth Corp. v. Allegheny Airlines, Inc.,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975).

## CONCLUSION

In sum, the court finds that it may approve the proposed settlement agreement and dismiss this case with prejudice, pursuant to the False Claims Act, absent the Attorney General's written consent. The court, nevertheless, finds the government has actually consented to the settlement. Moreover, the court has considered the government's objections and alternatives to the proposed settlement.

Accordingly, after careful review and consideration, the court hereby GRANTS the joint motion. The court, thus, approves the settlement agreement between relators and defendant as currently proposed and orders this action dismissed with prejudice.