**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 9 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID E. RIDENOUR; JEFFREY B.
PETERS; MARK GRAF,

     Plaintiffs-Appellants,

UNITED STATES OF AMERICA, ex
rel.,

     Plaintiff-Appellee,

v.

KAISER-HILL COMPANY, L.L.C.,
and Statutory Agent: Corporation
Services Company; WACKENHUT
SERVICES LIMITED LIABILITY
COMPANY, and Statutory Agent:
James A. Dierker; EG&G ROCKY
FLATS, INC., and Statutory Agent:
C.T. Corporation,

     Defendants-Appellees.

No. 01-1510

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-WM-2191)**

---

Wilbert Benjamin Markovits of Markovits and Greiwe Co., L.P.A., Cincinnati,
Ohio, (Phyllis E. Brown of Copeland & Brown Co., L.P.A., Cincinnati, Ohio;
Louise Roselle of Waite, Schneider, Bayless & Chesley Co., L.P.A., of
Cincinnati, Ohio; and James J. Christoph of McCormick & Christoph, P.C.,
Boulder, Colorado, with him on the briefs) for Plaintiffs-Appellants.

Douglas N. Letter, Appellate Litigation Counsel, (Robert D. McCallum, Jr., Assistant Attorney General, and John W. Suthers, United States Attorney, with him on the brief) Department of Justice, Washington, D.C., for Plaintiff-Appellee.

Gail D. Zirkelbach and Michael D. Schag of McKenna Long & Aldridge, L.L.P., Denver, Colorado; Gregory Kellam Scott of Kaiser-Hill Company, L.L.C., Golden, Colorado; Thomas J. Heiden of Miller, Canfield, Paddock & Stone, P.L.C., Grand Rapids, Michigan, on the briefs for Defendant-Appellee Kaiser-Hill Company, LLC.

Richard J. Webber of Arent Fox Kintner Plotkin & Kahn, P.L.L.C., Washington, D.C.; Dennis W. Brown and Stacy A. Carpenter of Baldwin & Brown, P.C., Denver, Colorado, on the brief for Defendant-Appellee Wackenhut Services Limited Liability Company.

John T. Boese and Michael J. Anstett of Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C.; and F. Gregory McKenna and Alan Epstein of Hall & Evans, L.L.C., Denver, Colorado, on the brief for Defendant-Appellee EG&G Rocky Flats, Inc.

---

Before **KELLY** and **O'BRIEN**, Circuit Judges and **EAGAN**[1], District Judge.

---

**O'BRIEN**, Circuit Judge.

---

This is a *qui tam* action,[2] filed under the False Claims Act (FCA), 31

---

[1] The Honorable Claire V. Eagan, U.S. District Judge, Northern District of Oklahoma, sitting by designation.

[2] The Latin phrase "*qui tam*" is an abbreviation for "qui tam pro domino rege quam pro se ipso in hac parte sequitur," meaning, "who as well for the king as for himself sues in this matter." Black's Law Dictionary 1262 (7th ed. 1999).

U.S.C. § 3729. David E. Ridenour, Jeffrey B. Peters, and Mark Graf (Relators) contend Appellees, security providers[3] at Rocky Flats Nuclear Weapons Plant (Rocky Flats), conspired to present for payment, knowingly presented, and were paid for, false claims for deficient, defective, or non-existent security measures, in violation of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3). After declining to intervene, the Government filed a motion to dismiss the action, which the district court granted. *United States ex rel. Ridenour v. Kaiser-Hill Co., L.L.C.,* 174 F. Supp.2d 1147 (D. Colo. 2001). Relators appeal.

Relators present several issues on appeal: (1) whether the district court applied the correct standard of review in granting the Government's motion to dismiss; (2) whether it erred in finding the Government met its burdens under the applied standard; (3) whether it erred in denying Relators' request to conduct certain discovery in preparation for hearing on the Government's motion to dismiss, their request to subpoena the Government's person most knowledgeable about the decision to seek dismissal, and their request to inquire at the hearing into the reasons underlying the dismissal decision; and (4) whether it erred in allowing the Government to present evidence refuting certain of the Relators' allegations where the parties had stipulated Relators' claim had merit. We

---

[3] Kaiser-Hill Company, L.L.C.; Wackenhut Services, L.L.C.; EG&G Rocky Flats, Inc.

exercise jurisdiction pursuant to 28 U.S.C. § 1291[4] and affirm.

## FACTUAL BACKGROUND

The Department of Energy (DOE) operated Rocky Flats[5] as a nuclear weapons manufacturing facility from 1953 through 1992. Rocky Flats is located near Golden, Colorado. In 1989, the Environmental Protection Agency (EPA) designated the by-then radiologically-contaminated facility a CERCLA[6] Superfund[7] site. The site is to be decontaminated and closed by 2006.

---

[4] Originally, the district court only dismissed with prejudice Relators' two counts brought under 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3). The court dismissed without prejudice their constructive discharge claim in violation of 31 U.S.C. § 3730(h). Relators filed their appeal before the resolution of this third claim. To cure this jurisdictional defect, they voluntarily dismissed with prejudice the constructive discharge claim. Because all claims that were presented to the district court are resolved, we have jurisdiction to hear this appeal.

[5] Rocky Flats and its operators have been involved in several other actions before us, dealing in some manner with nuclear contamination problems. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002) (*qui tam* action charging environmental violations); *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119 (10th Cir. 1994) (employees alleged retaliation for cooperating with the FBI in its investigation of environmental crimes); *Building & Const. Dept. v. Rockwell Int'l Corp.*, 7 F.3d 1487 (10th Cir. 1993) (employees presented medical monitoring claim for exposure to unsafe levels of radioactive and hazardous substances); *McKay v. United States*, 703 F.2d 464 (10th Cir. 1983) (land owners adjacent to Rocky Flats sued for damage to property caused by nuclear contaminants).

[6] CERCLA is the acronym for the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq*.

[7] Sites listed as CERCLA priority are entitled to EPA cleanup funding under a general federal fund for hazardous waste management. 42 U.S.C. § 9611;

-4-

Between 1989 and 1995, EG&G Rocky Flats, Inc., was the primary contractor with DOE for management and operations at Rocky Flats, which included security. During these same years, Wackenhut Services, L.L.C., contracted directly with the DOE to provide security at the site. In 1995, the DOE awarded Kaiser-Hill Co., L.L.C., the environmental cleanup contract at Rocky Flats. Since 1995, Kaiser-Hill has subcontracted the security portion of its contract to Wackenhut.

Relators performed security work at Rocky Flats, and each Relator independently voiced his concern about what he perceived as weak security. They ultimately filed suit as *qui tam* relators under the FCA on October 8, 1997, alleging EG&G, Wackenhut, and Kaiser-Hill were paid for security measures they either did not provide or provided below acceptable levels. At the time of the filing, Rocky Flats housed more than fourteen tons of weapons grade plutonium and six tons of highly enriched uranium. The Government requested and received several time extensions from the district court, totaling two years, in which it investigated the merits of the *qui tam* action. Pursuant to 31 U.S.C. § 3730(b)(2) and (b)(3), the case remained under seal during this investigation. Ultimately, the Government declined to intervene and the case was unsealed on December 14, 1999.

---

26 U.S.C. § 9507.

On April 13, 2000, the Government requested the DOE be added to the certificate of service to be kept aware of the progress of the suit. The Government became concerned about the handling of classified information and filed a status report concerning this issue on July 5, 2000. At a hearing on Defendants-Appellees' motion to stay proceedings pending the Government's resolution of classified information, the Government announced it would file a motion to dismiss, which it did on August 21, 2000.

The Government argued its motion to dismiss should be granted because the lawsuit would delay the cleanup and closure of Rocky Flats, as well as compromise national security interests by risking inadvertent disclosure of classified information. Relators opposed dismissal, claiming the Government was seeking dismissal for fraudulent and arbitrary and capricious reasons and the reasons for dismissal were not rationally related to a legitimate government purpose. They also argued the Government could not seek to dismiss the action without first intervening under 31 U.S.C. § 3730(c)(3). Relators sought discovery regarding the Government's stated reasons for dismissal and endeavored to subpoena the "most knowledgeable" government witness regarding the Government's reasons for dismissal. (Appellants' Br. at 2.) The district court denied these requests. After a five-day evidentiary hearing conducted pursuant to 31 U.S.C. § 3730(c)(2)(A), in which the Government stipulated for purposes of

the hearing that the Relators' claims were meritorious, the magistrate recommended the Government's motion to dismiss be granted. The district court adopted the recommendation and dismissed with prejudice the claims considered in this appeal.

## DISCUSSION

### I. FCA claims

We review de novo the district court's interpretation of the FCA and its determination of what standard to apply to the Government when it moves to dismiss a *qui tam* action. *See Foutz v. United States,* 72 F.3d 802, 804 (10th Cir. 1995) (construction of federal statutes reviewed de novo). We review the district court's dismissal of a *qui tam* action with prejudice for abuse of discretion. *Stone*, 282 F.3d at 809.

#### A. The FCA's Purposes and Provisions

The purpose of the FCA "is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. It empowers a private individual (a relator) to bring a civil claim on his or her own behalf, and on behalf of the Government, against a person or company who knowingly presents a false claim to the Government for payment. 31 U.S.C. §§ 3729(a), 3730(a) and (b)(1). The relator can only dismiss the action upon written consent

-7-

of the court and the Attorney General.[8]  § 3730(b)(1).  Amended in 1986, the most

substantial modifications to the FCA created an increased incentive for private

individuals to bring *qui tam* suits and granted the Government greater control

over these privately brought actions.  Congress increased the relator's incentive[9]

to bring *qui tam* actions by guaranteeing them a percentage of the recovery if the

action is successful, and slightly increasing their maximum potential recovery.  S.

Rep. No. 99-345, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292.

Relators are entitled to fifteen to twenty-five percent of the proceeds of the action

or settlement of the claim if the Government intervenes.  § 3730(d)(1).  If the

---

[8]  Even where the Government has declined to intervene, relators are required to obtain government approval prior to entering a settlement or voluntarily dismissing the action.  *See Searcy v. Philips Electronics N. Amer. Corp.*, 117 F.3d 154, 155 (5th Cir. 1997); *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 339 (6th Cir. 2000) (section 3730(b)(1) provides the Government with an absolute veto of any proposed *qui tam* settlement because the plain language of the statute does not limit this right).  *But see United States ex rel. Hullinger v. Hercules, Inc.*, 80 F. Supp.2d 1234, 1240 (D. Utah 1999) (limiting relator's obligation to seek government approval of a settlement to the initial sixty days plus extensions); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.*, 811 F. Supp. 346, 347 (E.D. Tenn. 1992).

[9]  The increased incentives to private individuals have proven effective at helping the Government recover substantial sums of fraudulently obtained payments.  From the effective date of the 1986 amendments to 2002, more than 3,000 *qui tam* cases were filed, resulting in nearly $5 billion in recovered monies from settlements and awards.  Gregory G. Brooker, *The False Claims Act: Congress Giveth and the Courts Taketh Away*, 25 Hamline L. Rev. 373, 382-84 (Spring 2002).  In just one fiscal year, from October 1, 2000, to September 30, 2001, relators received more than $210 million as part of their statutory share of the settlements and awards.  *Id.* at 383 n.72.

Government declines intervention, relators receive twenty-five to thirty percent. § 3730(d)(2). Relators are also given certain guarantees of involvement: if the Government proceeds with the action, the relators have the right to continue as a party, § 3730(c)(1); if the Government moves to dismiss the claim over relators' objections, they are entitled to a hearing, § 3730(c)(2)(A); and if the Government settles the claim, relators are entitled to judicial determination, via a hearing, that the Government's proposed settlement is fair, adequate, and reasonable, § 3730(c)(2)(B). S. Rep. 99-345, at 25-26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5290-91. *See also Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (Stevens, J., dissenting). These hearings, however, are only to be granted if relators can show a "substantial and particularized need for a hearing."[10] S. Rep. 99-345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291.

Through the 1986 amendments, Congress granted the Government additional opportunities to intervene and increased its power to control *qui tam*

[10]   It is not clear whether in practice this notice and hearing requirement has amounted to much of a hurdle for the government. However, we note that Congress apparently intended that the provision authorizing relators to formally object to any motions to dismiss or proposed settlements between the government and defendant should not pose a significant burden for the government or courts.
*United States ex rel. Kelly v. Boeing Co*., 9 F.3d 743, 754 n.11 (9th Cir. 1993).

actions. Under the old Act, the Government only had the initial sixty days in which to decide to intervene. The 1986 amendments allow the Government to obtain extensions beyond the initial sixty days in which to investigate the claims, and even if the Government initially declines to intervene, it can intervene later, at any time, upon a showing of good cause. S. Rep. 99-345 at 26-27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291-92; 31 U.S.C. § 3730(b)(3) and (c)(3).

The FCA prescribes the process for a *qui tam* action. After the relator files, the complaint remains under seal for at least sixty days, plus any extensions, during which time the Government has the opportunity to investigate the claim and determine whether it wants to intervene. § 3730(b)(2) and (3). After the Government intervenes or declines to intervene, the complaint is unsealed and served on the defendant. § 3730(b)(3). If the Government intervenes, whether initially or later under § 3730(c)(3), it takes over the primary responsibility of prosecuting the action and is not bound by the relator's acts. § 3730(c)(1). If the Government intervenes, the relator retains the right to continue as a party, subject to certain limitations. *Id.* Not only may the Government limit a relator's involvement, it may also stay discovery, or pursue alternate remedies against the defendant. § 3730(c)(2)(C), (c)(2)(D), (c)(4), and (c)(5). If the Government declines to intervene in the action, the relators have the right to conduct the

action, subject, however, to possible future intervention by the Government upon a showing of good cause. § 3730(c)(3). The Government can dismiss or settle the action despite the relator's objections. § 3730(c)(2)(A) and (c)(2)(B).

**B. Intervention**

At the outset, we consider Relators' argument that the Government must intervene under § 3730(c)(3) before moving to dismiss under § 3730(c)(2)(A).[11] The magistrate determined the FCA did not contain this requirement. The district court disagreed. Nonetheless, it construed the Government's motion to dismiss as including an implied motion to intervene, and identified as good cause for the motion the intent of the Government to dismiss the case.[12] We decline to construe

---

[11] This argument relates to our consideration of the correct standard of review for dismissal as follows. The Relators contend we should apply a good cause standard to the Government's motion to dismiss because this is the standard for late intervention. As they put it,

> It is impossible to analyze whether there is "good cause" for late intervention without also analyzing whether there is "good cause" for the dismissal that prompts the intervention. The False Claims Act's "good cause" provision should be interpreted to require a meaningful, probing and substantive review of the government's decision to seek dismissal.

(Appellants' Br. at 11.) Thus, in aid of resolving the issue of the correct standard of review to apply to the Government's dismissal, we first consider whether the Government must intervene under § 3730(c)(3) before moving to dismiss under § 3730(c)(2)(A).

[12] "Having decided . . . that the government may move to dismiss a meritorious case in which it initially declined to participate, it is an unavoidable conclusion that the movant has good cause to intervene to exercise that right." (Appellants' Br., Tab D at 5.)

the FCA as requiring intervention for cause before dismissal because a plain reading of the statute does not require it, canons of statutory construction do not support such a result, and in our view, such a reading would render the FCA constitutionally infirm.

The FCA provides "[t]he Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A). In interpreting this provision, we rely on a longstanding canon of statutory construction which we recently revisited in *NISH v. Rumsfeld*:

> As a general rule, statutory language is to be interpreted according to the common meaning of the terms employed. Our analysis of statutory construction must begin with the language of the statute itself, and [absent] a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.

348 F.3d 1263, 1268 (10th Cir. 2003) (quotation marks, citations and alteration omitted). Applying this canon, we identify nothing in the language of § 3730(c)(2)(A) to suggest the authority of the Government to dismiss a *qui tam* action is dependent upon prior intervention in the case. Nor can we identify legislative intent to the contrary. In fact, the Senate report incident to passage of the measure spelled out the purpose of late intervention.

> Under current law, the Government is barred from reentering the litigation once it has declined to intervene during this initial period.

-12-

The Committee recognizes that this limited opportunity for Government involvement could in some cases work to the detriment of the Government's interests. Conceivably, new evidence discovered after the first 60 days of the litigation could escalate the magnitude or complexity of the fraud, causing the Government to reevaluate its initial assessment or making it difficult for the *qui tam* relator to litigate alone. In those situations where new and significant evidence is found and the Government can show 'good cause' for intervening, paragraph (2) provides that the court may allow the Government to take over the suit.

S. Rep. 99-345, at 26-27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291-92.

This language clearly suggests the purpose of late intervention is to pursue litigation, not dismiss it.

The D.C. Circuit has recently held the Government need not first intervene in a *qui tam* action before moving to dismiss it. Although the case concerned a government motion to dismiss during the seal period, the court's reasoning applies with equal force to a motion to dismiss filed after the seal period:

[Section] 3730(b)(2) makes intervention necessary only if the government wishes to "proceed with the action." Ending the case by dismissing it is not proceeding with the action; to "proceed with the action" means, in the False Claims Act, that the case will go forward with the government running the litigation.

*Swift v. United States,* 318 F.3d 250, 251 (D.C. Cir.), *cert. denied*, 539 U.S. 944 (2003).[13] As we just noted, the purpose of late intervention, as with intervention

---

[13] The *Swift* court suggested the justification for dismissal would necessarily provide the good cause for intervention:

In any event, the question whether the False Claims Act requires the

-13-

in the seal period, is to proceed with the action. Other courts have agreed in dicta that prior intervention is not necessary to enable a government motion to dismiss. *See Juliano v. Fed. Asset Disposition Ass'n,* 736 F. Supp. 348, 351 (D. D.C. 1990), *aff'd,* 959 F.2d 1101 (D.C. Cir. 1992); *Kelly,* 9 F.3d at 753 n.10; *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.,* 151 F.3d 1139, 1145 (9th Cir. 1998); *United States ex rel. Friedman v. Rite Aid Corp.,* 152 F. Supp.2d 766, 772 (E.D. Pa. 2001).

Our holding comports with constitutional concerns as well. As the Supreme Court has instructed, "it is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, [we] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis,* 533 U.S. 678, 689 (2001) (quotation marks omitted). The constitutionality of the FCA has been challenged several times under the claim it violates the separation of powers doctrine inherent in the Take Care Clause.[14] In this case, we examine whether the

> government to intervene before dismissing an action is largely academic. As Swift conceded at oral argument, if there were such a requirement, we could construe the government's motion to dismiss as including a motion to intervene, a motion the district court granted by ordering dismissal.

318 F.3d at 252.

[14] The Executive Branch is entrusted with the duty to "take Care that the Laws be faithfully executed . . . ." U.S. Const., art. II, § 3.

-14-

Government would be unconstitutionally hamstrung by a requirement, as urged by Relators, to intervene with a showing of good cause before moving to dismiss a *qui tam* action.

In a case where the Government successfully intervened upon a showing of good cause, we have previously held the *qui tam* provisions are constitutional under the Take Care Clause. *Stone*, 282 F.3d at 807. We expressly reserved the question of whether the *qui tam* provisions would pass constitutional muster if the Government was denied intervention for cause. *Id.* at 806 n.6. *Stone* cited favorably to decisions of other circuits that have uniformly held the FCA is constitutionally sound as long as it is interpreted as vesting in the Executive Branch sufficient control over *qui tam* actions so there is no violation of its duty to enforce the laws of the land. The Fifth Circuit has stated the Government retains sufficient control of a *qui tam* action to save the FCA from being unconstitutional because the Government can veto settlements without intervening, and it "retains the unilateral power to dismiss an action notwithstanding the objections of the person." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc) (quotation marks omitted). The Ninth Circuit has concluded the FCA does not violate the doctrine of separation of powers because the Government retains sufficient control over *qui tam* actions, including the power "albeit somewhat qualified, to end *qui tam*

litigation." *Kelly*, 9 F.3d at 754. These limitations to which the *Kelly* court refers are the FCA requirements to give the relator notice and a hearing. *Id.* at 753. The Sixth Circuit has also concluded the FCA scheme embraces sufficient provisions to assure the freedom of the Government to control a *qui tam* action. *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.,* 41 F.3d 1032, 1041 (6th Cir. 1994). *See also Stevens,* 529 U.S. at 801 (history of *qui tam* action in England and America sufficient to establish it does not implicate Take Care Clause).

Although the *qui tam* provisions have thus far withstood constitutional challenge, we conclude that to condition the Government's right to move to dismiss an action in which it did not initially intervene upon a requirement of late intervention tied to a showing of good cause would place the FCA on constitutionally unsteady ground. Because we are to interpret statutes in a manner that renders them constitutionally valid, *Zadvydas*, 533 U.S. at 689, we should avoid an interpretation that unnecessarily binds the Government. Therefore, we conclude that the Government, in a case in which it has declined to intervene in the seal period, is not required to intervene with a showing of good cause under § 3730(c)(3) before moving to dismiss the action under § 3730(c)(2)(A). Nor do we engraft a good cause requirement on a government motion to dismiss.

**C. Dismissal**

We turn now to the correct standard of review of a government motion to dismiss a *qui tam* action under 31 U.S.C. § 3730(c)(2)(A).  Although the Act itself is silent as to the standard of review of a motion to dismiss, the Senate Report incident to passage of this section explained its purpose:

> [W]hen the Government takes over a privately initiated action, the individual who brought the suit will be served, upon request, with copies of all pleadings filed as well as deposition transcripts. Additionally, the person who brought the action may formally object to any motions to dismiss or proposed settlements between the Government and the defendant.
>
> Any objections filed by the *qui tam* plaintiff may be accompanied by a petition for an evidentiary hearing on those objections.  The Committee does not intend, however, that evidentiary hearings be granted as a matter of right.  We recognize that an automatic right could provoke unnecessary litigation delays. Rather, evidentiary hearings should be granted when the *qui tam* relator shows a 'substantial and particularized need' for a hearing. Such a showing could be made if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary and improper considerations.

S. Rep. 99-345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291.[15]

---

[15]  In *Swift*, the D.C. Circuit discounted this language insofar as it might illuminate the standard of review of a government motion to dismiss a *qui tam* action in which it had not intervened because the language related to an earlier version of § 3730(c)(2)(A) that was not enacted.  318 F.3d at 253.  The earlier version permitted a relator to object to government dismissal only in cases in which the Government had intervened.  *Id.*  Notwithstanding this distinction, we consider the language of the Senate report instructive on the standard of review of a government motion to dismiss a *qui tam* action whether or not the Government has previously intervened.

In *Swift*, the D.C. Circuit considered the standard to apply to a government motion to dismiss a *qui tam* action where the Government has not previously intervened and the defendant has not yet been served. 318 F.3d at 251. In its view, the Government's decision to dismiss is nearly unreviewable.[16] Section 3730(c)(2)(A)'s "opportunity for a hearing" language is simply intended to provide a forum for the relator to try to convince the Government not to dismiss the case. *Id.* at 253. The court reserved deciding the correct standard to apply in instances where the defendant was already served. *Id.* at 252-53. Because the case we review is one in which the defendants were served, and because under these circumstances we construe the hearing language of § 3730(c)(2)(A) to impart more substantive rights for a relator, we look to the Ninth Circuit for guidance.

The Ninth Circuit took up the standard of review of a government motion to dismiss a *qui tam* action in *Sequoia v. Baird-Neece,* 151 F.3d 1139. In that case, relators filed thirty-four *qui tam* actions against entities involved in the citrus industry, alleging violations of citrus fruit marketing orders promulgated by the Secretary of Agriculture. *Id*. at 1141. The Government elected to intervene in only ten of these actions. *Id*. at 1142. Five years after the initial filing of the *qui*

---

[16] The *Swift* court indicated there might be exceptions to unfettered government discretion to dismiss a *qui tam* action as, for example, where fraud on the court is alleged. 318 F. 3d at 253.

*tam* actions, the Government moved to intervene in the remaining cases under § 3730(c)(3), upon showing good cause. *Id*. The Government declared it would litigate the *qui tam* actions if settlement could not be reached. *Id*. A year later, the Government announced its intent to withdraw from the *qui tam* cases. *Id*. Later still, the Government moved to dismiss the cases under § 3730(c)(2)(A), over relators' objections. *Id*. For purposes of the motion to dismiss, the Government, as in this case, conceded the relators' claims were meritorious. *Id.* at 1143.

The Ninth Circuit established the following standard for testing whether dismissal by the Government is appropriate: "(1) identification of a valid government purpose; and (2) a rational relation between dismissal and accomplishment of the purpose." *Id*. at 1145 (quotation marks omitted). If the Government satisfies this two-step test, "the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Id.* (quotation marks omitted). The district court here applied this standard, and we adopt it. In our view, it recognizes the constitutional prerogative of the Government under the Take Care Clause, comports with legislative history, and protects the rights of relators to judicial review of a government motion to

dismiss.[17]

We next examine whether the district court erred in finding the Government met the standard set in *Sequoia v. Baird-Neece*, and in dismissing with prejudice the Relators' action. After an exhaustive review of the record, we conclude the court did not abuse its discretion in dismissing the *qui tam* action.

**1. Rational Relation to Valid Government Purpose**

The Government argues that protecting classified information from disclosure and the timely closing of the contaminated Rocky Flats facility[18] are valid governmental purposes supporting its motion to dismiss the *qui tam* action. Relators agree. Where the parties part company, however, is on the question of whether dismissal of the action bears a rational relation to the stated objectives. Based on evidence adduced at the five-day evidentiary hearing, the district court, adopting the recommendation of the magistrate, concluded that it does. We concur.

---

[17] We do not decide at this time whether § 3730(c)(2)(A) gives the judiciary the right to pass judgment on the Government's decision to dismiss an action where the defendant has not been served and where the Government did not intervene in the action, facts of the sort presented in *Swift*.

[18] Rocky Flats houses radiological and chemical contaminants that pose a risk to public safety and the environment. It is scheduled to close in December 2006, and clean-up is currently in progress. A closure delay would cost approximately one million dollars a day and expose area residents to continued health and environmental risks. In excess of two and a half million people live within a fifty-mile radius of Rocky Flats.

The Government demonstrated that classified documents required in the litigation[19] would present a risk of inadvertent disclosure, implicating national security. The degree to which classified documents could be declassified or redacted was unknown. However, anyone handling classified information would need a security clearance. The magistrate judge found that the risk of inadvertent disclosure of classified information was greatest where much classified information was involved in the litigation; the risk lessened where classified information could be declassified or redacted. In the court's view, the risk of inadvertent disclosure, even if theoretically minimal, as the Relators argued, was sufficient to justify dismissal of the action. As the *Sequoia* test instructs, to establish a rational relation to a valid governmental purpose, "[t]here need not be a tight fitting relationship between the two; it is enough that there are plausible, or arguable, reasons supporting the agency decision." *United States ex. rel. Sequoia Orange Co. v. Sunland Packing House Co.,* 912 F. Supp. 1325, 1341 (E.D. Ca. 1995) (quotation marks omitted). The Government met the test here.

The Government also demonstrated the litigation would delay the clean-up and closure of Rocky Flats by diverting the focus of security planners and management from the clean-up effort, by requiring the reassignment of personnel

---

[19] The Government estimates litigation would require review of thousands of classified documents; Relators claim this estimate is highly exaggerated.

from the project to a review of classified documents for declassification or redaction in aid of litigation, and by placing an added financial burden on the project through a requirement to shift funds from clean-up to litigation. The Relators argued that many of their claims could have been determined without a significant diversion of resources by the Government. The magistrate concluded that while the evidence of diversion of resources from the clean-up effort to litigation was not "concrete" (Appellants' Br., Tab I at 21), it sufficiently established the likelihood of some diversion of resources, and "any diversion of personnel attention away from the closure project would negatively impact the closure schedule."[20] (*Id.* at 22) Once again, the Government satisfied the *Sequoia* test by advancing a "plausible, or arguable" reason for the dismissal. *Id.*

## 2. Arbitrary and Capricious

Once the Government meets its burden of establishing a rational relationship between dismissal of a *qui tam* action and a valid government purpose, the "burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Sequoia v. Baird-Neece*, 151 F.3d at 1145 (quotation marks omitted). Relators' principal argument is that the

---

[20] The district court took into account a rational cost/benefit analysis conducted by the Government establishing that the benefits that might be obtained by successful prosecution of the *qui tam* action were outweighed by the risk the litigation would divert resources from the clean-up effort and delay closure of Rocky Flats.

Government's motion to dismiss was fraudulent because it was motivated by a desire to spare DOE embarrassment over security lapses at Rocky Flats.[21] They contend a revolving door of employment between the DOE and its contractors at Rocky Flats fostered a climate of cover-up of security violations at the facility, including misuse of classification of documents in aid of the cover-up, and inspired both the DOE and its contractors to prevail upon the Department of Justice to dismiss the *qui tam* action. The district court found that while there was evidence of innocent cross-employment between the DOE and its contractors, there was no evidence that either the DOE or any of its contractors prevailed upon the Department of Justice to dismiss the action for improper purposes. In fact, there was no evidence the Department of Justice exercised anything other than its independent judgment in deciding to dismiss the case. While the evidence suggested vigorous disagreement over security at Rocky Flats, the court declined to construe this as evidence that the Government's decision to dismiss was in aid of a cover-up. In fact, as the court noted, the alleged security deficiencies were reported to the Secretary of Energy, Congress and the press, and led to an

---

[21] Relators offered additional evidence of an arbitrary and capricious decision to dismiss: the Government waited until eight months after the seal period to move to dismiss, even though the reasons it offered for dismissal were known to it when the complaint was filed; and the Government did not dismiss a similar case. The district court concluded these allegations, while true, did not, without more, demonstrate the decision to dismiss was arbitrary and capricious.

-23-

investigation by the DOE Inspector General. In all of this heat, the district court found no light. Neither do we. The district court correctly concluded the Relators failed to meet their burden to show the Government's motion to dismiss was fraudulent, arbitrary and capricious, or illegal.

## II. Discovery and Other Rulings in Limine

In preparation for the hearing on the Government's motion to dismiss, the magistrate stayed discovery. The district court approved the stay. We review discovery rulings for an abuse of discretion. *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550 (10th Cir. 1995), *cert. denied,* 517 U.S. 1190 (1996). The discovery Relators wanted to conduct would have involved classified documents. Thus, discovery would have allowed what the Government was trying to avoid in moving to dismiss the action: divulging classified information. Furthermore, the Relators sought through discovery to challenge the Government's motivation behind the dismissal.[22] The magistrate denied the requested discovery on the grounds it would reach classified information and was irrelevant to the question of whether the proposed dismissal was rationally related to a valid governmental

---

[22] Relators sought to depose "the Government personnel whose affidavits were attached in support of the United States Motion to Dismiss, Government personnel with primary involvement in the United States decision to decline intervention, and Government personnel with primary involvement in the United States decision to file the Government's motion to dismiss." (Appellants' App., Vol. III at 779.)

purpose. The court limited Relators' proof to their own witnesses and documents and cross-examination of government witnesses.

We expect the district court to exercise its discretion in determining when and how to limit discovery. Clearly, the district court did not abuse its discretion in this case in limiting discovery so as to avoid revelation of classified information, particularly when this was one of the very purposes behind the Government's motion to dismiss. Neither, for the reasons we next discuss in relation to the deliberative process privilege, did it err in denying inquiry into the Government's subjective motivation behind its dismissal.

Ruling in limine, the magistrate quashed the Relators' subpoena of the Government's person most knowledgeable about its motion to dismiss.[23] Furthermore, she indicated she would apply the deliberative process privilege at the hearing to any communications between government agents that were pre-decisional or deliberative relative to the motion to dismiss. Relators object to both rulings as a bar to what they claim is a legitimate inquiry into the subjective motivation of the Government in filing its motion to dismiss. We review a decision to quash a subpoena and evidentiary rulings of the trial court for abuse of discretion. *Heat & Control, Inc. v. Hester Indus., Inc.,* 785 F.2d 1017, 1022

---

[23] Relators issued a subpoena under Fed. R. Civ. P. 30(b)(6) for the testimony of the "person most knowledgeable" about the Government's motion to dismiss.

(Fed. Cir. 1986) (quash subpoena); *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1433 (10th Cir. 1993) (evidentiary ruling).

The magistrate was correct to quash the subpoena for the Government's person most knowledgeable about its motion to dismiss for the plain reason that Fed. R. Civ. P. 30(b)(6), the provision under which the subpoena issued, authorizes a subpoena for deposition, and not in-court testimony. As to the deliberative process privilege, it

> "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."

*Casad v. U.S. Dep't of Health & Human Servs.*, 301 F.3d 1247, 1251 (10th Cir. 2002) (quoting *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (quotations and citations omitted)). Relators argue the Government should not be allowed the protection of the deliberative process privilege because they seek to establish the Government's motivation, for which the privilege is unavailable. They rely on *In re: Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 156 F.3d 1279 (D.C. Cir. 1998). The unavailability of the privilege in that case, however, did not extend to inquiries into the Government's subjective motivation for a decision. *Id.* at 1280. "When a party challenges agency action as arbitrary and capricious the

-26-

reasonableness of the agency's action is judged in accordance with its stated reasons. Agency deliberations not part of the record are deemed immaterial." *Id.* at 1279 (citation omitted). Therefore, the district court was correct to apply the deliberative process privilege.

## III. Stipulation of Facts

Prior to the evidentiary hearing on the motion to dismiss, the Government agreed to stipulate, for purposes of the hearing, that Relators' claims of security deficiencies at Rocky Flats had merit. Relators quibble that the district court erred in allowing the Government to present evidence refuting certain of the Relators' factual allegations. We review the lower court's decision to admit, exclude, limit or refuse to limit the scope of the evidence for abuse of discretion. *McCue v. State of Kansas, Dept. of Human Res.*, 165 F.3d 784, 788 (10th Cir. 1999).

Relators list only two examples of statements they believe challenged the merits of their claims. In one, a Government witness expressed doubts the Relators would win anything in the lawsuit. He felt the nuclear material at Rocky Flats was secure. He believed the potential benefits of prosecuting the lawsuit were outweighed by the benefits of timely closure of the facility. In the same vein, the Government argued in closing that it preferred timely closure to the uncertain benefits at the end of a lawsuit. We first note that a stipulation to the

merit of a claim does not translate into automatic recovery on the claim. Therefore, it was fair for the Government to weigh potential benefits from the lawsuit against the perceived benefits of terminating the action immediately. Next, Relators do not explain, nor can we understand, how the Government statements they cite negate the stipulation that there were security deficiencies at Rocky Flats. Finally, Relators provide no authority to support their contention that when parties stipulate that one side's claim has merit for purposes of streamlining a hearing, the opposing party is prevented from presenting evidence pertaining to the very questions for which the hearing is being conducted. Because Relators failed to cite to legal authority regarding this argument, and because we find this argument completely lacks merit, it fails. *F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1230 (10th Cir. 2000).

## CONCLUSION

We hold the FCA does not require the Government to intervene prior to moving to dismiss a *qui tam* action, we adopt the *Sequoia* standard for reviewing the Government's motion to dismiss, and we find it has met its burden under *Sequoia v. Baird-Neece*. We also hold the district court did not abuse its discretion in its rulings in discovery or in limine. We **AFFIRM** the decision of the district court.

No. 01-1510, *Ridenour v. Kaiser-Hill Co., L.L.C.*,

**EAGAN**, J., dissenting in part and concurring in part and in the result.


I dissent only on the basis of the majority's determination that the FCA does not require the Government to intervene prior to moving to dismiss a *qui tam* action. In my view, where the Government has declined to intervene during the sixty-day seal period, it is required to intervene upon a showing of good cause under 31 U.S.C. § 3730(c)(3) before moving to dismiss the action. I believe a plain reading of the statute requires it, canons of statutory construction support such a result, and such a reading does not render the FCA unconstitutionally infirm.

The majority's focus on the provision of the statute which permits the Government to dismiss a *qui tam* action, 31 U.S.C. § 3730(c)(2)(A), disregards the surrounding provisions and the context in which the dismissal provision appears. Subsection (c)(2) relates to (c)(1), which provides:

> If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action **subject to the limitations set forth in paragraph (2).**

31 U.S.C. § 3730(c)(1)(emphasis added). Thus, subsection (c)(2) contains limitations applicable only to subsection (c)(1), the provision relating to the Government's election to proceed with the action. By their terms, subsections

(c)(1) and (c)(2) do not apply where the government elects not to proceed during the seal period.  Subsection (c)(3), however, relates to the Government's election not to proceed, as here.  It provides, in relevant part:

> If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. . . . When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

*Id.*, § 3730(c)(3).  This is the subsection which provides for late intervention by the Government after an initial determination not to proceed.

In effect, the majority's reading of the statute eviscerates the provision addressing late intervention.  Familiar canons of statutory construction direct the court to avoid such an interpretation.  *E.g.*, *Oxy USA, Inc. v. Babbitt*, 268 F.3d 1001, 1006 (10th Cir. 2001) ("We must avoid, whenever possible, a statutory interpretation that would 'render superfluous other provisions in the same enactment.'" (quoting *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 877 (1991)); *New Mexico Cattle Growers Ass'n v. United States Fish and Wildlife Serv.*, 248 F.3d 1277, 1285 (10th Cir. 2001) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous." (quoting *Bridger Coal Co./Pac. Minerals, Inc. v. Director, Office of Workers' Compensation Programs*, 927 F.2d 1150, 1153 (10th Cir.1991))).  Congress clearly intended to provide for late intervention by the Government.

Further, this court has long acknowledged: "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *In re Wise*, 346 F.3d 1239, 1241 (10th Cir. 2003) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, (1997)); *see Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1151 (10th Cir. 2002) (citations omitted) ("To determine the plain meaning of the statute, we must consider the statute as a whole."); *Wyoming v. United States*, 279 F.3d 1214, 1230 (10th Cir. 2002) (To construe legislation, the court examines "the purpose, structure, and legislative history of the entire statute." (quoting *California v. Federal Energy Regulatory Comm'n,* 495 U.S. 490, 504 (1990)); *In re Overland Park Financial Corp.*, 236 F.3d 1246, 1252 (10th Cir. 2001) ("When interpreting statutory language, this court 'must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'") (citation omitted.); *United States v. Nichols*, 184 F.3d 1169, 1171 (10th Cir. 1999) ("When interpreting statutory language, however, appellate courts must examine the ... language in context, not in isolation."). Here, the context, design, and structure of the statute as a whole indicate that the government has unfettered discretion to dismiss if it intervenes within the sixty-day seal period, but not after.

The legislative history cited by the majority speaks to the circumstances of this case: "In those situations where new and significant evidence is found and the Government can show 'good cause' for intervening, paragraph (2) provides that the court may allow the Government to take over the suit." S. Rep. 99-345, at 26-27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292. This legislative history relates to the section of the amendment which became subsection (c)(3) of the statute. The legislative history is clear that late intervention requires good cause and even suggests that it requires new and significant evidence. Contrary to the conclusion of the majority, taking over the suit does not mean that intervention under subsection (c)(3) is permitted only if the government plans to proceed. Such is too expansive a reading of the legislative history. It does mean taking control of the action -- which inherently includes the ability to seek dismissal.

Examination of the statutory language in context and in light of the legislative history does not place the FCA on unsteady constitutional ground. The Take Care Clause of the United States Constitution entrusts the Executive Branch with the duty to "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3. The FCA vests in the Executive Branch sufficient control over *qui tam* actions; I do not read it to vest the Executive Branch with absolute control where the Executive Branch effectively abdicates its duty to control the litigation

by failing to intervene initially within the seal period or to show good cause for late intervention. The Government is not bound unnecessarily by a requirement to intervene with a showing of good cause before moving to dismiss a *qui tam* action.

To the extent the Government's motion to dismiss can be construed as an implied motion to intervene, the issue becomes, then, whether the Government showed good cause for intervention. The district court found that mere intent of the Government to dismiss the case constitutes good cause. Such finding effectively eliminates the need to intervene at all, a finding which, again, renders the FCA's late intervention provision superfluous. I therefore disagree with the district court as to what constitutes good cause. In my view, the Government did show good cause by demonstrating that the lawsuit would compromise national security interests and delay the cleanup and closure of Rocky Flats.

I recognize that there is persuasive authority from other jurisdictions to support the majority's conclusion as to intervention, but I believe that those courts have engaged in iconoclastic statutory construction to reach that conclusion. As the majority acknowledges, the decision in *Swift v. United States*, 318 F.3d 250, 251 (D.C. Cir.), *cert. denied*, 539 U.S. 944 (2003), concerned a government motion to dismiss during the seal period, and the language in other cases occurs in *dicta*, *Kelly*, 9 F.3d at 753 n.10; *United States ex rel. Friedman v.*

*Rite Aid Corp.*, 152 F. Supp. 2d 766, 772 (E.D. Pa. 2001); *Juliano v. Fed. Asset Disposition Ass'n* , 736 F. Supp. 348, 351 (D.D.C. 1990), or simply ignores the language in 31 U.S.C. § 3730(c)(3) that the court may permit late intervention "without limiting the status and rights of the person initiating the action." *See Sequoia*, 151 F.3d at 1145 (9th Cir. 1998). The *Juliano* court recognized that subsection (c)(2)(A), "by its placement in the statute, appears to pertain to actions in which the government has already intervened," but reasoned that the "distinction is not crucial." 736 F. Supp. at 351. In my opinion, the distinction is crucial. If Congress intended the construction placed upon the statute by these courts, it would have chosen an alternative placement or omitted the limitations present in the statutory language.

The majority declined to "engraft a good cause requirement on a government motion to dismiss." Maj. Op. 17. I believe that its holding as to intervention essentially engrafts the *Sequoia* standard on a government motion to intervene after the seal period, and that such action contravenes the express language of the statute, as well as Congressional intent. For these reasons, I respectfully dissent. However, I concur in the result because, here, the Government has shown good cause to intervene under 31 U.S.C. § 3730(c)(3), as the district court found, and the reasons for intervention support dismissal under any standard.