**F I L E D**

**PUBLISH**

**October 19, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE PROCTER & GAMBLE COMPANY,
and THE PROCTER & GAMBLE
DISTRIBUTING COMPANY,

    Plaintiffs-Appellants,

v.

RANDY L. HAUGEN, FREEDOM TOOLS
INCORPORATED, FREEDOM
ASSOCIATES, INC., STEVEN E. BRADY,
STEPHEN L. BYBEE, EAGLE BUSINESS
DEVELOPMENT, INC., TED RANDALL
WALKER, and WALKER
INTERNATIONAL NETWORK,

    Defendants-Appellees.

No. 03-4234

---

MICROSOFT CORPORATION,
EXXONMOBIL CORPORATION, NIKE,
INC., and LAWYERS FOR CIVIL
JUSTICE,

    Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 1:95-CV-0094 K)**

---

Arthur R. Miller, Cambridge, MA (Tracy H. Fowler, Michael D. Zimmerman, and
James D. Gardner, Snell & Wilmer, Salt Lake City, UT, and Stanley M. Chesley
and Paul M. DeMarco, Waite Schneider Bayless & Chesley Co., LPA, Cincinnati,

OH, with him on the briefs), for plaintiffs-appellants.

Joseph J. Joyce (Kristin A. VanOrman and James D. Franckowiak with him on the briefs), Strong & Hanni, Salt Lake City, UT, for defendants-appellees.

David H. Remes, Covington & Burling, Washington, DC, for Microsoft Corporation, ExxonMobil Corporation, Nike, Inc., and Lawyers for Civil Justice, as Amici Curiae.

---

Before **KELLY, BRISCOE,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

In 1995, the Procter & Gamble Company and the Procter & Gamble Distributing Company (hereinafter jointly referred to in the singular as P&G) filed this action against the Amway Corporation (Amway) and certain of its distributors asserting claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Utah common law. The district court's subject matter jurisdiction was based on 28 U.S.C. §§ 1331, 1332, and 1367. In March 1999, the district court granted summary judgment to defendants on some of P&G's claims and dismissed the remaining claims. P&G appealed and, in August 2000, this court reinstated the Lanham Act and tortious interference claims and remanded the case for further proceedings. Procter & Gamble Co. v. Haugen, 222 F.3d 1262, 1280 (10th Cir. 2000). In June 2001, the district court dismissed all claims against Amway and granted partial summary judgment in favor of the distributor defendants with

2

respect to P&G's tortious interference claim. P&G again appealed, and this court affirmed the district court's dispositive rulings, thereby leaving only P&G's Lanham Act claim against the distributor defendants to be litigated. Procter & Gamble Co. v. Haugen, 317 F.3d 1121 (10th Cir. 2003).

In the present appeal, P&G now challenges the district court's dismissal of that remaining Lanham Act claim on the grounds that (1) P&G failed to preserve and produce to defendants relevant electronic data and (2) P&G's expert testimony was inadmissible at trial. P&G also appeals two discovery-related rulings issued by the district court prior to dismissal. Lastly, P&G seeks reassignment of the case to a different district court judge on remand. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm two discovery-related rulings, reverse the order of dismissal, remand for further proceedings, and deny P&G's request for a reassignment of the case on remand.

I.

P&G is the manufacturer and distributor of numerous products for personal care, household use, and consumption. On August 28, 1995, P&G filed its complaint in this case against, among others, defendant Randy Haugen, a Utah citizen and distributor of Amway consumer products, and two Utah corporations, Freedom Associates, Inc., and Freedom Tools Incorporated, utilized by Haugen in his Amway distribution business. P&G's complaint alleged that in 1995, Haugen

3

disseminated a voice-mail message to thousands of other Amway distributors falsely stating that the president of P&G had recently appeared on television, announced that he (the president of P&G) was associated with the Church of Satan, and stated that a large portion of the profits from forty-three different P&G products were used to support the Church of Satan. P&G's complaint further alleged that, as a result of Haugen's message and its dissemination, P&G lost customers concerned about supporting Satan through their purchase of P&G products. P&G's complaint asserted claims against Haugen and his corporations under the Lanham Act and Utah state law.[1]

In its initial post-complaint efforts at assessing damages, P&G assigned one of its own employees, Steven McDonald, who worked as a financial analyst and profit forecaster, to analyze whether, and if so, how much, the Satanism rumors had impacted the sales and market share of the forty-three P&G products referred to in Haugen's voice-mail message. In his effort to do so, McDonald turned to "market share information" that was available to P&G from an unrelated, Chicago-based company called Information Resources Incorporated (IRI). App. at 571, 575. IRI regularly gathered "scanner data of consumer purchases" from "grocery stores, drug stores and mass market merchandisers (e.g., Wal-Mart)

---

[1] P&G's complaint also asserted claims against other defendants, including Amway. Those claims have since been decided against P&G and are not at issue in this appeal.

4

throughout the United States," and, pursuant to a contract with P&G, in turn compiled and maintained various "electronic market share database[s]" for P&G's use. Id. at 571. These databases "contain[ed] market share[] [information] for a given product type (e.g., detergent powder) and . . . correlate[d] sales to factors such as price, advertising, coupons, and display." Id. Notably, the databases were maintained on a rolling basis meaning that "[a]t any given time," they "contain[ed] monthly data for the prior 30 months and weekly data for the prior 65 weeks," and as IRI added new data to the databases, it simultaneously deleted old data from the databases. Id. P&G, primarily for marketing purposes, contracted with IRI for production of and access to databases pertaining to P&G's consumer products. In turn, P&G's employees regularly accessed the databases, via on-line terminals at P&G's facilities, and incorporated some of the information into reports.

After McDonald allegedly concluded that the IRI data available to him was inconclusive regarding the effects of the Satanism rumor on the sales of P&G's products, P&G hired two expert witnesses, Dr. Robert Hall and Dr. Harvey Rosen, to investigate and testify regarding this issue. Like McDonald, both Hall and Rosen turned to the IRI data to conduct their analyses. According to the record, Hall focused his analysis on "ten P&G products for sixty markets covering December 1994 through May 1997." Id. at 576. Rosen, using "archival data

5

specially purchased from IRI" by P&G for an approximate cost of $75,000.00 (as opposed to the on-line data regularly made available by IRI to P&G), focused his analysis on five P&G products (Tide, Crest, Pampers, Downy and Charmin).[2] Id. at 577; see id. at 396.

At issue in this appeal is the extent to which defendants requested production of the IRI market share data from P&G and, in turn, the extent to which P&G complied with those requests. According to defendants, they made three requests pursuant to Federal Rule of Civil Procedure 34 for production of, or access to, the IRI market-share data. The first such discovery request pointed to by defendants occurred on November 27, 1995, when defendants asked P&G to produce for inspection and copying "[a]ny documents which [P&G] believe[d] evidence[d] . . . loss of sales or revenues [resulting from defendants' conduct], including summaries of product sales during and immediately prior to the time in question (in the geographic areas which [P&G] believe[d] were impacted)," as well as, "[f]or comparison purposes, similar documents evidencing sales and revenue for all other areas in the United States, during the same time periods . . . ." Id. at 131.

The second request pointed to by defendants occurred approximately five

---

[2] IRI's on-line data was organized by cities. In contrast, the archival data purchased from IRI for Rosen's use was organized by zip code.

months later, on April 22, 1996, when defendants asked P&G to produce "for inspection and copying" the following categories of documents: (1) "[s]ummaries of product sales at the retail level in the states of Utah, Nevada, and Texas from April 1994, to the present"; (2) "[f]or comparison purposes, similar documents evidencing sales and revenues for all other areas in the United States during the same time period"; (3) "[m]emoranda, correspondence, or other documents indicating sales strategies and plans which were implemented during the same time period"; (4) "[a]ny market forecasts or analyses within your possession which express an opinion, a forecast, or an analysis as to whether the sales of any products produced by [P&G] and marketed in the United States [we]re expected to increase or decrease in the next five years"; (5) "[a]ny document which refer[red] to Amway Corporation or competition with Amway products from April, 1993, until April, 1995"; and (6) "[a] computation of any category of damages claimed by [P&G] and all documents or other evidentiary material, not privileged or protected from disclosure, on which such computation [wa]s based, including materials bearing on the nature and extent of injuries suffered." Id. at 135-36.

The third and final request pointed to by defendants occurred on October 22, 1996, when Amway, while still a defendant in the case, requested from P&G a host of documents pertaining to the "[a]lleged harm to P&G's reputation and

purported damages," including "[a]ll documents explaining or analyzing changes in P&G's market share, by region, product, and any other classification, since 1980." Id. at 145.

In addition to these three discovery requests, defendants contend the district court issued four separate orders directing P&G to produce the IRI data before it ultimately sanctioned P&G for failing to comply. The first of those orders was issued on January 31, 1997, by the magistrate judge in response to defendants' motion to compel discovery. Id. at 152-54. It directed P&G to "provide a description of the nature of injuries and losses it ha[d] sustained and, to the extent that it . . . ha[d] sufficient information to do so, . . . provide a computation of each category of damages within the meaning of Rule 26(a)(1)(C) by February 20, 1997."[3] Id. at 153.

The second court order cited by defendants was issued on July 27, 1998, by the magistrate judge in response to defendants' motion to compel production of documents related to P&G's damage claim. That order directed P&G to produce, within thirty days, "at least 24 boxes of responsive documents for Tide laundry

---

[3] On February 20, 1997, P&G filed supplemental responses to Amway's October 22, 1996 request for production of documents. Therein, P&G indicated that it might be in possession of "information on electronic databases" that was responsive to Amway's requests for documents, including information "explaining or analyzing changes in P&G's market share, by region, product, and any other classification, since 1980." App. at 159.

8

detergent and documents responsive to Request Nos. 1, 6-21 and 23 of Defendant

Haugen's Third Request for Production of Documents, which concern[ed] P&G's

alleged damage to its reputation." Id. at 176. The order further stated:

> After defendants have inspected the Tide documents, they will
> provide P&G with a list of responsive documents. For each P&G
> brand that competes with an Amway product, P&G will then produce
> all the responsive documents within a reasonable time, but efforts
> should be made to complete the production within 30 days of service
> of Amway's list.

Id. at 176-77.

The third court order cited by defendants was issued on December 8, 1998,

by the magistrate judge. On that date, the magistrate judge conducted a hearing

on various discovery-related motions. During the course of the hearing, the

magistrate judge instructed P&G to produce to Amway (and presumably the other

defendants) within forty-five days from the date of the hearing "the IRI data

relating to the competing products from which [P&G] ma[d]e [its] claim of loss."

Id. at 225. In making this order, the magistrate judge clarified the scope of what

P&G was required to produce: "if you [P&G] have it in usable electronic data

base format, so that that electronic data base could be programed [sic] to draw

down the material in a variety of constructs, that then that ought to be produced in

that form. If it is not available in that form but is only available in a reproduction

format, then the reproduction format would be what you need to produce." Id. at

222-23. The magistrate judge further stated: "I'm not going to require you [P&G]

9

to construct a whole new system to provide the information, but you must provide the data you have, and if you have a system that will allow for an analytical assessment of the information within that system, then they ought to have an opportunity to access that in its electronic form." Id. at 223. Notably, the magistrate judge acknowledged, after making his ruling, that Amway had not previously requested this information (i.e., information on products other than Tide) from P&G. The magistrate judge also indicated that he would not be imposing any sanctions on P&G for any alleged failure to produce evidence.

On February 8, 1999, the magistrate judge issued an order memorializing his ruling during the December 8, 1998, hearing. In particular, the order stated that "by January 22, 1999," P&G was required to produce "IRI data for P&G products that compete with Amway products." Id. at 293. "If P&G has this information in a usable electronic data base format, so that the data could be programmed to draw down the material in a variety of constructs, it should be produced in that form. If P&G has a system that will allow for an analytical assessment of the information within that system, defendants must be provided an opportunity to access it. If the IRI data is not available in an electronic form but is only available in a reproduction format, then the reproduction format should be produced . . . ." Id. at 293-94. Notably, the order again implied that P&G had not

10

previously been required to produce such information to defendants.[4]  Id. at 293

("In addition to production governed by prior orders, P&G must produce the

following . . . .").

The fourth and final order cited by defendants was issued by the district

court during a hearing held on February 26, 2003, regarding discovery-related

motions.  During that hearing, the district court heard arguments regarding the

distributor defendants' motion to compel "documents going to damages."  Id. at

370.  In support of their motion, defendants argued, as they do now on appeal,

that they began seeking IRI data in November of 1995.  Although defendants

acknowledged that the document requests they served on P&G in November 1995

did not "specifically name[]" the IRI data, they argued that the document requests

effectively encompassed that data.  Id. at 373 ("It wasn't specifically named, but

it would encompass it.").  Defendants also acknowledged that the December 8,

1998 order issued by the magistrate judge was the first time that P&G had been

---

[4] As previously noted, the district court on March 29, 1999, granted
summary judgment in favor of defendants on certain of P&G's claims, and
dismissed with prejudice P&G's remaining claims against defendants.  App. at 74
(docket sheet).  P&G appealed that ruling.  On August 23, 2000, this court
reinstated P&G's Lanham Act and tortious interference claims and remanded
those claims to the district court for further proceedings.  On June 7, 2001, the
district court issued an order dismissing Amway from the case, and granting
partial summary judgment in favor of the remaining defendants with respect to
P&G's tortious interference claim.  That left only P&G's Lanham Act claim
against the distributor defendants to be litigated.

11

directly instructed to produce IRI-related data.  Id. at 376 ("Then December 8, finally, the Court orders P&G to produce IRI data.").  Although defendants admitted P&G had provided them with the IRI data used by Dr. Rosen in analyzing damages, they argued they were entitled to all of the IRI data that P&G had access to during the course of the litigation, and that, due to P&G's alleged failure to produce such data, they were entitled to dismissal of P&G's claims for lost profits.

In response to defendants' arguments, P&G noted that defendants had been provided with access to all of the IRI data that Dr. Rosen had access to in preparing his expert report, and that this data was sufficient to allow them to adequately challenge Rosen's testimony at trial.[5]  In this regard, P&G clarified that it was "not interested in pursuing loss of profits for any products but the three" consumer products that Rosen had focused on in his expert report.  Id. at 405.  P&G further noted that, in a similar case being litigated between the parties in Texas, IRI had "offered to provide to counsel for defendants all or any data in the possession of IRI that the defendants wanted, which was all of the [data regarding the] competing products," but that IRI was going to charge a large fee for doing so.  Id. at 395.  Thus, P&G argued, defendants were effectively

_____

[5] By the time of this hearing, P&G had apparently decided not to use the testimony of Dr. Hall, and instead was relying solely on the testimony of Dr. Rosen to support its claim for lost profits/market share.

12

attempting to persuade the court to pass this cost on to P&G.

In reply, defendants asserted they were entitled to production of all the IRI data available to P&G from November 1995, when P&G employee McDonald first began looking at the data to assess lost sales/profits, through December 1998. Defendants further asserted that, during the time P&G subscribed to the IRI database, P&G "could have downloaded that information and maintained it, [but] they failed to do that." Id. at 407. Lastly, defendants acknowledged that the magistrate judge, in ordering P&G to produce IRI-related data, had limited that production to the data previously provided to P&G's own experts.

Ultimately, the district court ruled: "Well, on the IRI [data], it seems to me the only question is – I mean, you [P&G] can look and see if you've got something you may have that you didn't think you had, and if you do, produce it. And then you [P&G] can say what you don't have. And then you [defendants] can decide what you want to ask me to do about it. And you [P&G] can respond to that, all right?" Id. In other words, the district court did not order P&G to purchase any additional archival data from IRI for defendants' benefit. Instead, the district court limited its order of production to only that IRI data in the possession of P&G.

On April 18, 2003, defendants filed a motion for sanctions as a result of P&G's alleged "spoliation of electronic market share data." Id. at 568. In

13

support of their motion, defendants first asserted that the IRI data available to P&G employees from November 1995 through December 1998 was "critical to the defense." Id. at 571. More specifically, defendants argued that their "economic expert, Dr. Finis Welch, "need[ed] access to all the IRI data to determine whether the repeating of the Satanism message by the Defendants had any economic impact (i.e., lost sales) on P&G's business." Id. at 572. According to defendants, "[a]lthough Dr. Welch agree[d] that IRI data constitute[d] the best information for studying any economic effect of the rumor message, he believe[d] that Dr. Rosen's use of highly selective data provide[d] no scientific basis for his conclusions." Id. As a second basis for their motion, defendants argued that P&G had wilfully failed to preserve the IRI data. Id. at 573. According to defendants, "P&G did nothing to preserve the data, not only after it had been requested several times, but even after production had been ordered by the Court on four separate occasions." Id. As a third basis for their motion, defendants argued that P&G was well aware of the importance of the IRI market share data to the case. Id. at 574. In support of this assertion, defendants argued that P&G provided its own experts with access to the IRI database, but "then saved only the carefully-selected material that it provided to Rosen," i.e., the archival information it purchased from IRI for purposes of the case. Id. at 577. As a fourth basis for their motion, defendants argued that P&G, by failing to produce

14

all of the IRI data, "violated several court orders." Id. at 578. Lastly, defendants argued that the entry of a default judgment in their favor was the appropriate sanction for P&G's alleged wrongful conduct.

P&G filed a response opposing defendants' motion for sanctions. In that response, P&G first noted that it had simply been an online subscriber to the data provided by IRI, and that its subscription contract did not allow it to download all of the information contained in IRI's databases. Second, P&G noted that, even if had sought to download all of the information in IRI's databases, it would have been required to purchase a mainframe computer like the one owned and used by IRI. In other words, P&G asserted that "IRI's data was so massive that P&G's computer system could not handle a download of the IRI databases." Id. at 919. Third, P&G asserted that it had produced to defendants all documents in its possession that incorporated or referenced the IRI data accessed by its employees. Fourth, P&G asserted that the IRI data, in the form regularly accessed online by P&G employees for marketing purposes, would not have been helpful in assessing damages in this case. In support of this assertion, P&G noted that it had to purchase $75,000.00 worth of archival data from IRI in a special format (i.e., grouped by zip-code) for its expert, Dr. Rosen, and that such data had already been provided to defendants. Fifth, P&G noted that IRI had offered to make the sought-after databases available to defendants, but that defendants had refused to

15

pay for the information. Lastly, P&G argued that it had not violated any discovery-related orders issued by the magistrate judge or the district court. To the contrary, P&G asserted that it had "complied with the discovery orders of January 31, 1997, July 21, 1998, and December 8, 1998," and that it was "accumulat[ing], and w[ould] shortly be producing, the . . . 1999 documentation requested by defendants in 2003." Id. at 924.

On July 15, 2003, the district court held a hearing on defendants' motion for sanctions. Defendants argued, in pertinent part, that "P&G could have provided a terminal to the defense to access the IRI data at no cost," and that the magistrate judge had, in fact, directed P&G to do so "in December of '98. Get access. Let the defendants have access to the information at no cost." Id. at 1021. Defendants further argued that "[t]he problem [wa]s they [P&G] never preserved what they should have preserved in the first place." Id. at 1036. In other words, defendants argued that, beginning in 1995 or 1996, P&G should have preserved all of the IRI online data it had access to. P&G, in response, asserted that it had preserved and provided defendants with "[w]hatever data was downloaded [from IRI's database] through [P&G's normal business practices] and used in any way, shape or form for business purposes . . . ." Id. at 1025. P&G emphasized, however, that at no time did it ever own, or have authority to download, all of the information contained in the IRI database. Lastly, P&G

16

noted that IRI was willing to sell any archival data to defendants that they might want. At the conclusion of the hearing, the district court made no ruling, but instead took the matter under advisement.

On August 19, 2003, the district court issued a two-page order granting defendants' motion for sanctions. The order stated, in full:

> Defendants' Motion for Sanctions was heard by the Court on July 15, 2003. * * *
>
> The Court has reviewed the file, considered the arguments of counsel, reviewed the memoranda supporting and opposing the motion, and has reviewed governing authority. After due consideration of the foregoing, the Court grants Defendants' Motion and dismisses this case with prejudice for each of the following three reasons (in other words, each reason standing alone would be sufficient for the Court's ruling in this matter):
>
> 1. Based on the reasons and arguments set forth by Defendants in support of their motion, the Court is convinced that Plaintiffs have failed to preserve relevant electronic data that Plaintiffs knew was critical to their case and to the defense. The Court is also persuaded that Plaintiffs have violated four (4) separate discovery orders requiring production of said data.
>
> 2. Based on the reasons and arguments set forth in Defendants' motion and supporting memoranda, the Court finds that it would be basically impossible for Defendants to defend this case without the electronic data that has not been produced and apparently is no longer available. Defendants would need access to all relevant IRI data to determine whether the Satanism message produced lost sales with respect to all of the products included in said Satanism message.
>
> 3. The Court finds that damages testimony and studies

17

based on five or fewer of the more than forty products at issue here would not be admitted in evidence under Rule 702 of the Federal Rules of Evidence and the <u>Daubert</u> line of cases regarding the admissibility of expert testimony. Such testimony clearly would not be based upon sufficient facts or data to be admissible in this Court. Since Plaintiffs' damages evidence would not be admissible, Plaintiffs' claims must fail.

Defendants' Motion to Dismiss this case with prejudice is granted for each of the foregoing three reasons discussed. All other outstanding motions in this case are moot. Each party shall bear its own costs.

<u>Id.</u> at 1057-58.

## II.

The primary focus of P&G's appeal is on the district court's August 19, 2003 order dismissing the case. Although that order cited "three reasons" for dismissing the case, P&G argues, and we agree, that the order was actually grounded on two separate bases: (1) P&G's alleged wrongful conduct and the prejudice allegedly suffered by defendants as a result thereof, and (2) the purported inadmissibility of P&G's expert testimony. P&G challenges both. As outlined in greater detail below, we agree with P&G that neither of these bases justify dismissal and we therefore reverse the order of dismissal and remand the case to the district court for further proceedings.

*Sanction of dismissal*

P&G asserts several challenges to the portion of the district court's August

18

19, 2003 order dismissing P&G's action as a sanction for P&G's "F]AILURE] to preserve relevant electronic data . . . ." Before addressing the specific arguments made by P&G, we must first resolve the threshold question of what standard of review to apply to that portion of the district court's decision.

The district court did not cite to any rule or authority in its order granting defendants' motion for sanctions. Because, however, defendants' motion relied largely upon Federal Rule of Civil Procedure 37(b)(2), we presume the district court likewise relied on that same rule in dismissing the action based on P&G's alleged failure to preserve electronic data and the resulting prejudice allegedly suffered by defendants. Rule 37(b)(2) authorizes a district court to sanction a party who "fails to obey an order to provide or permit discovery . . . ." Included among the available sanctions is "[a]n order . . . dismissing the action or proceeding or any part thereof . . . ." Fed. R. Civ. P. 37(b)(2)(C). In reviewing a district court's decision to dismiss an action under Rule 37(b)(2), we generally apply an abuse of discretion standard. See Creative Gifts, Inc. v. UFO, 235 F.3d 540, 549 (10th Cir. 2000).

Although a district court is afforded discretion in choosing an appropriate sanction, that discretion "is limited in that the chosen sanction must be both just and related to the particular claim which was at issue in the order to provide discovery." Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992) (internal

19

quotation marks omitted).  Dismissal with prejudice "represents an extreme sanction," id., and thus is considered appropriate only in cases involving "willfulness, bad faith, or [some] fault" on the part of the party to be sanctioned. Chavez v. City of Albuquerque, 402 F.3d 1039, 1044 (10th Cir. 2005) (internal quotation marks omitted).  "In many cases, a lesser sanction will deter the errant party from further misconduct."  Ehrenhaus, 965 F.2d at 920.  "Because dismissal with prejudice defeats altogether a litigant's right of access to the courts, it should be used as a weapon of last, rather than first, resort."  Id. (internal quotation marks omitted).

"Before imposing dismissal as a sanction, a district court should ordinarily evaluate the following factors on the record: '(1) the degree of actual prejudice to the [other party]; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.'"  Gripe v. City of Enid, 312 F.3d 1184, 1187 (10th Cir. 2002) (quoting Ehrenhaus, 965 F.2d at 921).  "This list," hereinafter referred to as the Ehrenhaus factors, "is not exhaustive, nor are the factors necessarily" of equal weight.  Chavez, 402 F.3d at 1044.  "Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction."  Ehrenhaus, 965 F.2d

at 921 (internal quotation marks omitted).

As discussed in greater detail below, we conclude in this case that the district court erred in imposing dismissal as a sanction for P&G's alleged misconduct. Not only did the district court fail to consider the Ehrenhaus factors on the record, our own independent review of the record on appeal suggests that several of the Ehrenhaus factors weighed in favor of P&G, and that, in any event, the extreme sanction of dismissal was clearly inappropriate under the circumstances presented here.

*a. Failure to consider Ehrenhaus factors on the record*

P&G argues that the district court's order of dismissal must, at a minimum, be reversed due to the district court's failure to address on the record any of the Ehrenhaus factors. We agree. As we have said in the past under similar circumstances, the district court's failure to provide "a detailed evaluation of these factors on the record" makes "it . . . impossible for us to "engag[e] in any meaningful review of the trial court's decision." Mobley v. McCormick, 40 F.3d 337, 341 (10th Cir. 1994). Although defendants assert that the district court's order of dismissal incorporated by reference the arguments asserted in their motion for sanction, which in turn addressed the Ehrenhaus factors, it is unclear from the record whether the district court agreed with the defendants' assessment of each of those factors. Moreover, as discussed in greater detail below, our

21

independent review of the record refutes many of the arguments made by defendants in their motion. Thus, "we must hold" that the district court's failure to address the Ehrenhaus factors on the record "amounts to an abuse of discretion." Id.

   *b. Culpability of P&G*

P&G argues that, even aside from the district court's failure to address the Ehrenhaus factors on the record, the sanction of dismissal was inappropriate because there was no basis for concluding that it acted willfully, in bad faith, or with culpability. More specifically, P&G argues that the only action it conceivably failed to take was "to create a computerized database out of all the online IRI data that ever had been available to [it] from 1995 through 1998, even though [it] never actually had accessed, much less downloaded, the vast majority of the data, which were being deleted and replaced continuously by IRI." Aplt. Br. at 23.

Our independent review of the record on appeal persuades us that P&G was indeed faced with a dilemma regarding preservation and production of the IRI data. As noted, P&G did not possess nor own that data. Rather, the record indicates that the data was compiled, possessed, and owned by IRI, which in turn provided P&G with access to that data for a fee. Although the IRI data in general could be deemed to have fallen within certain of defendants' broadly-worded

22

discovery requests, it is unclear precisely how P&G was to produce that data to defendants. The most reasonable alternatives appear to have been (a) providing defendants with regular online access to the information, (b) attempting to download and archive the information at P&G's facilities, or (c) paying IRI to provide the archived data to defendants.[6] That said, each of these alternatives involved a considerable downside. The first option, providing defendants with regular online access to the information, would not necessarily have satisfied defendants' discovery requests due to the "rolling" nature of the IRI database. In other words, it appears from the record that defendants were interested in obtaining a concrete set of IRI-related data (i.e., a set of data with established beginning and ending dates) rather than merely access to the rolling database. As for the second option, P&G downloading and archiving the data at its own facilities, the record appears to be uncontroverted that P&G did not have the computer capacity to do so and would, in fact, have had to purchase a mainframe computer to do so.[7] The third option, purchasing archival data from IRI, bore a

---

[6] There also appear to have been two other alternatives: (1) P&G arguably could have asked IRI to make back-up copies of its data at certain points in time (although this likely would have cost P&G additional money beyond the price of its subscription agreement with IRI); and (2) defendants could arguably have used Rule 45 to subpoena information directly from IRI.

[7] The evidence in the record suggests that P&G would have had the right, under its contract with IRI, to download all of the data from the rolling databases had it wanted to. Aplee. App. at 352.

considerable economic expense. According to P&G, the cost of obtaining the requested archival data from IRI would have been somewhere in the neighborhood of thirty million dollars.[8]

Although the district court's order of dismissal makes reference to P&G "fail[ing] to preserve relevant electronic data," the district court offered no explanation of what it meant by "relevant electronic data," and what steps it believed P&G could and should have taken to preserve such data. App. at 1057. Moreover, at no time during the litigation did the district court or the magistrate judge ever address either of these issues. As noted in P&G's opening brief, the first court order expressly mentioning IRI data was the magistrate judge's December 8, 1998 order. That order directed P&G to provide defendants with IRI data "possessed" by P&G, and thus arguably failed to clarify P&G's duties regarding preservation and/or production of the IRI data available to P&G online (as opposed to the IRI data that was actually downloaded by P&G employees and incorporated into reports, etc.). To be sure, the December 8, 1998 order mentioned the possibility of P&G providing defendants with access to any computer systems that allowed for analysis of the IRI data. However, that order

---

[8] The district court was obligated to take into account Federal Rule of Civil Procedure 26(b)(2)(iii), which provides: "The frequency or extent of . . . discovery . . . shall be limited by the court if it determines that . . . the burden or expense of the proposed discovery outweighs its likely benefit . . . ."

was again framed in terms of IRI data "possessed" by P&G, and thus arguably failed to address the unique circumstances of this case.

Similarly, the district court expressly addressed the IRI data on only one occasion before entertaining defendants' motion for sanctions and dismissing P&G's case. Specifically, on February 26, 2003, after hearing oral arguments regarding defendants' motion to compel damage-related evidence, the district court simply directed P&G to ensure that it had produced all IRI-related data in its possession. In other words, the district court did not order P&G to purchase any additional archival data from IRI for defendants' benefit.

Given these circumstances, it is simply unclear what the district court considered P&G's duties to have been regarding preservation and production of the IRI-related data. In turn, it is impossible to conclude that P&G acted with the requisite culpability to justify the sanction of dismissal.

*c. Prejudice to defendants*

In its order of dismissal, the district court found "that it would be basically impossible for Defendants to defend this case without the electronic data that has not been produced and apparently is no longer available." App. at 1058. More specifically, the district court stated: "Defendants would need access to all relevant IRI data to determine whether the Satanism message produced lost sales with respect to all the products included in said Satanism message." Id.

25

P&G challenges this finding as "groundless." Aplt. Br. at 41. According to P&G, defendants "defended themselves without" all of the IRI-related data "in a parallel Texas action brought by P&G." Id. at 42. Indeed, P&G alleges, the court in that Texas case "rejected defendants' argument that they would be unable to defend themselves unless they could get all of the IRI data to which P&G had temporary access in prior years." Id. In the instant case, P&G notes, defendants "have received all of the information, documents and materials in the possession, custody, or control of P&G and its experts," and defendants also had the opportunity to "purchase[] directly from IRI any additional data they believed was necessary . . . ." Id.

We conclude, after examining the record on appeal, that the district court's finding of prejudice, unsupported by any detailed explanation, is clearly erroneous. See generally Olcott v. Delaware Flood Co., 76 F.3d 1538, 1557 (10th Cir. 1996) ("We accept the district court's factual findings underpinning its sanctions order unless clearly erroneous."). As noted in the background section, P&G paid IRI to compile and offer it access to the data for marketing purposes. When this litigation began, P&G initially attempted to use the IRI data available to it online for purposes of assessing the damages, if any, that resulted from the Satanism rumors. According to P&G, however, the online data was not organized in a way that allowed for such analysis. Accordingly, its sole remaining expert on

26

damages, Dr. Rosen, requested that P&G purchase archival data from IRI that was formatted in a different fashion than the online data, i.e., by zip code. P&G complied with this request, and Dr. Rosen in turn based his damages analysis on the archival data. Although defendants now assert that it was necessary for them to have had access to all of the IRI online data in order to rebut Dr. Rosen's testimony, this assertion is supported by little, if any, evidence in the record on appeal. In other words, although it certainly would have been preferable if defendants had somehow been afforded access to the IRI data, it is far from clear that such data would have been useful for rebutting Dr. Rosen's testimony, since it was formatted in a different fashion than the data utilized by Dr. Rosen. Thus, we conclude that genuine issues of material fact remain concerning whether defendants were in fact prejudiced by their lack of access to all the IRI-related data, and if so, how much they were prejudiced.

### d. Other *Ehrenhaus* factors

P&G asserts that none of the remaining Ehrenhaus factors "could possibly justify dismissal" either. Aplt. Br. at 42. In particular, P&G asserts that "[n]either the district judge nor the magistrate judge ever gave P&G any advance warning that dismissal would be a likely sanction if it failed to retrieve, preserve, and produce all of the IRI data to which it had temporary access from 1995 to 1998 – including the data that P&G never downloaded and that long since had

been deleted by IRI." Id. at 42-43. Further, P&G argues that the district court "never considered the[] efficacy" of "lesser sanctions" "as alternatives to dismissal." Id. at 43.

We again agree. As asserted by P&G, there is no indication in the record on appeal that the magistrate judge or the district court ever warned P&G that its suit was subject to dismissal if all of the IRI-related data was not made available to defendants. For example, at the February 26, 2003 hearing before the district court concerning defendants' motion to compel, the district court simply instructed P&G to ensure that it had produced to defendants all of the IRI-related data in its possession. No mention was made by the district court of dismissal as a possible sanction. Further, as asserted by P&G, there is no indication in the district court's order of dismissal that it gave any consideration to lesser sanctions.

*e. Conclusion*

In summary, we conclude the district court's order of dismissal, to the extent it was intended as a sanction for P&G's alleged failure to preserve electronic data and the alleged resulting prejudice, was improper and must be reversed.

*Inadmissibility of P&G's expert testimony*

P&G also challenges the second basis for dismissal cited by the district

28

court, i.e., the purported inadmissibility of P&G's expert testimony regarding damages. P&G notes that at the time of dismissal, it "had not submitted any expert reports to the district court, the district court had not heard any expert testimony, and no motion to limit or exclude P&G's expert was before the court." Aplt. Br. at 17. Thus, P&G argues, "[b]y [its] ruling the district court improperly entered a *sua sponte* summary judgment without following the mandatory Rule 56 procedures." Id.

It is beyond dispute that "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all [expert] testimony ... is not only relevant, but reliable.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)). Although a district court "has no discretion to avoid performing the gatekeeper function," it "has discretion in how it conducts [this] function . . . ." Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003). This "broad discretion applies both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." Id. We "will not disturb the district court's ruling unless it is 'arbitrary, capricious, whimsical or manifestly unreasonable' or when we are convinced that the district court 'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Id. (quoting

29

<u>Atlantic Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1163-64 (10th Cir. 2000)).

Applying those principles here, it is without question that the district court would have had to, at some point, determine the admissibility of Dr. Rosen's testimony regarding damages. That said, we conclude there are at least two major problems with the district court's ruling that Dr. Rosen's testimony was inadmissible. First, a review of the record on appeal confirms P&G's contention that it had absolutely no warning prior to the district court's order of dismissal that the district court would be considering, let alone ruling on, the admissibility of Dr. Rosen's testimony. Second, and relatedly, the district court failed to "creat[e] . . . 'a sufficiently developed record in order to allow a determination of whether [it] properly applied the relevant law." <u>Id.</u> Undoubtedly due to the lack of prior notice, neither side in this case provided the district court with detailed briefing regarding the admissibility of P&G's expert's testimony. In turn, there were no "detailed" or "specific" findings by the district court on the record regarding why it concluded the testimony was inadmissible. <u>Id.</u> To the contrary, the circumstances of the district court's ruling (i.e., its surprise nature and its lack of specificity) strongly suggest that the district court "'simply made an off-the-cuff decision to [exclude] the expert testimony.'" <u>Id.</u> (quoting <u>Goebel v. Denver & Rio Grande Western R.R. Co.</u>, 215 F.3d 1083, 1088 (10th Cir. 2000)). For

30

these reasons, we conclude the district court abused its discretion in ruling that Dr. Rosen's testimony was inadmissible and in dismissing P&G's claims on that basis.

## III.

In addition to challenging the district court's order of dismissal, P&G also challenges two discovery-related rulings issued by the district court prior to its order of dismissal. First, P&G contends the district court erred in "denying protection to P&G's confidential commercial information by allowing the Distributor Defendants to disclose it to Amway," even though Amway "was no longer a party to this action" at the time of the production of the documents. Aplt. Br. at 17. Second, P&G contends the district court erred "by requiring P&G to produce five documents that were subject to work product protection and the attorney-client privilege." Id. We review discovery-related rulings for an abuse of discretion. Ridenour v. Kaiser-Hill Co., L.L.C., 397 F.3d 925, 938 (10th Cir. 2005).

*Disclosure of information to Amway*

During much of the litigation, the district court imposed a protective order that prevented the disclosure of confidential documents to non-parties. On April 28, 2003, P&G filed a motion asking the district court to "enforce or modify" that protective order so as to prohibit the distributor defendants from disclosing

31

P&G's "confidential information to former defendants or their counsel or consultants in this litigation." App. at 556. In support of the request, P&G argued that: (1) "the former defendants . . . ha[d] no right to current confidential information"; (2) "the former defendants [we]re direct competitors of [P&G] and disclosure of confidential information could put [P&G] at a competitive disadvantage"; and (3) "allowing disclosure of confidential information to the former defendants would defeat the purpose of" the previously imposed protective order. Id.

The district court heard arguments on P&G's motion on July 15, 2003 (at the same time it heard arguments on defendants' motion for sanctions). Defense counsel argued that they were "using Amway [and its counsel] as a consultant" in this litigation. Id. at 1043. Defense counsel further argued that there was no risk to the confidentiality of the documents because all persons associated with Amway had signed confidentiality agreements and were bound by the court's previously issued protective order. Id. at 1044.

On July 16, 2003, the district court issued a written order denying P&G's motion. In its order, the district court stated:

> Because Amway's counsel previously took the laboring oar in this case and in the Texas case, and because Defendants had different counsel in the Texas litigation and were not even parties in the Michigan litigation [a case filed by Amway against P&G], limiting Defendants' ability to consult with Amway's counsel would severely prejudice Defendants in this case. P&G's alleged concerns are

32

unwarranted and unsubstantiated. There is no allegation that Amway's counsel have violated the Protective Order, and Amway's counsel remain bound by the Protective Order.

Id. at 1053.

On appeal, P&G essentially rehashes the arguments it made to the district court. We conclude, however, that the district court properly rejected those arguments. Moreover, P&G has failed to rebut the district court's findings that defendants would be "severely prejudice[d]" if the district court limited their ability to consult with Amway's counsel, and that Amway's counsel has not violated and indeed remains bound by the previously issued protective order. Thus, we conclude there was no abuse of discretion on the part of the district court.

*Production of privileged documents*

On December 8, 1998, the magistrate judge ordered P&G to produce to defendants five documents that allegedly were memoranda to and from P&G's in-house counsel regarding investigation of Satanism rumors and the thoughts and impressions of counsel regarding litigation over these rumors." P&G objected to the magistrate judge's ruling, arguing that the documents were subject to work-product protection and the attorney client-privilege, but the district court dismissed the action before addressing P&G's objection. After this court reversed and remanded the case for further proceedings, the district court entertained

33

P&G's objections to the magistrate judge's order and ultimately overruled those objections.

On appeal, P&G contends the district court erred in ordering production of the five documents. Notably, however, P&G has not submitted any of these documents to us for review. Instead, P&G's sole argument is that, even though it submitted the five documents to the district court for *in camera* review, the district court failed to conduct such a review before ordering them to be produced.

After carefully reviewing the record on appeal, we reject P&G's assertion. To begin with, it is uncontroverted that the five documents were submitted to the district court for *in camera* review on what appears to have been two separate occasions (before a February 26, 2003 hearing on P&G's objections, and again in April 2003). Further, the district court issued a written order on May 21, 2003, expressly overruling P&G's objections to the magistrate judge's December 8, 1998 order directing P&G to produce the documents. App. at 992. Finally, at a July 10, 2003 hearing on various motions, the district court reiterated that it intended for the five documents to be produced. Id. at 1047-48. Notably, the court made no mention of not having had an opportunity to review the documents *in camera* before ruling on them. In light of all these circumstances, we conclude there is no basis for finding that the district court failed to conduct an *in camera*

34

review of the five documents.

IV.

Finally, P&G contends that the "interests of justice demand" that the case be reassigned to another district court judge on remand. Aplt. Br. at 56. In support of its contention, P&G asserts that "the bizarre, plainly deficient rulings challenged in this appeal" demonstrate "that the district judge harbors such serious antipathy toward" P&G's "claims that reassignment to a different judge is necessary to ensure a fair and impartial trial on remand." Id.

It is well established that we have authority, apart from the judicial disqualification statutes, to reassign a case to a different district judge on remand. Mitchell v. Maynard, 80 F.3d 1433, 1448 (10th Cir. 1996) (discussing sources of authority). Because of "the extraordinary nature" of such an order, however, we "will remand with instructions for assignment of a different judge only when there is proof of personal bias or under extreme circumstances." Id.

In our view, P&G has failed to satisfy these difficult standards. To begin with, P&G has not asserted, nor is there any evidence in the record, that the district court has a personal bias against P&G or its counsel. In the absence of personal bias, that leaves only what we have referred to as "extreme circumstances." Id. Although P&G suggests that the district court's rulings at issue in this appeal were so "plainly deficient" as to demonstrate "serious

35

antipathy" on the part of the district court towards P&G's claims, we have held "that prior adverse rulings cannot in themselves create grounds for disqualification." Id. at 1449. Further, although P&G asserts that the district court's "track record" in this case would case a reasonable person to question whether justice was being done in this case, all P&G can point to in support of this assertion is the district court's legal rulings, some of which have been affirmed by this court in prior appeals. In other words, unlike the circumstances at issue in Mitchell, the record contains no expressions of disapproval by the district court regarding P&G, its counsel, or its claims. Id. at 1450 (reassigning case where first judge overseeing case stated on the record that the plaintiff's claims were "frivolous" and a "waste of the jury's time . . . .").

The judgment of the district court is AFFIRMED in part and REVERSED in part and the case REMANDED to the district court for further proceedings. Plaintiffs' request for a reassignment of the case on remand is DENIED.